903 F.2d 635
 58 USLW 2682, 60 Ed. Law Rep. 728, 15
Fla. L. Week. D2682
 CLOVIS UNIFIED SCHOOL DISTRICT, Plaintiff-Appellant, Cross-Appellee,
v.
CALIFORNIA OFFICE OF ADMINISTRATIVE HEARINGS; and Ronald
Diedrich, Hearing Officer, Defendants-Appellees,
William Honig, California State Superintendent of Public
Instruction; and California State Department of
Education, Defendants-Appellees,
Cross-Appellants.
Michelle Shorey, Real Party in Interest-Appellee, Cross-Appellant.
 Nos. 86-2747, 86-2825, 86-2842, 87-1537 and 87-1554.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 14, 1987.
Submission Vacated April 7, 1988.
Resubmitted March 12, 1990.
Decided May 3, 1990.
 
 Diana K. Smith, Lozano Smith Smith & Woliver, San Francisco, Cal., for Clovis Unified School Dist., plaintiff-appellant and cross-appellee.
 Joyce Eckrem and Michael E. Hersher, California State Dept. of Educ., Sacramento, Cal., for William Honig, California State Superintendent of Public Instruction, and the California State Dept. of Educ., defendants-appellees and cross-appellants.
 John K. Van de Kamp, Atty. Gen., and Richard M. Frank and Paul Dobson, Supervising Deputy Attys. Gen., Sacramento, Cal., for Michelle Shorey, Real Party in Interest, defendant-appellee and cross-appellant, and for the California Office of Administrative Hearings and Ronald Diedrich, Hearing Officer, defendants-appellees.
 Ronald D. Wenkart, Costa Mesa, Cal., for the Anaheim City School Dist., et al., Amicus.
 Andrea M. Miller, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, Cal., for the California Ass'n of School Boards, Amicus.
 Appeal from the United States District Court for the Eastern District of California.
 Before SCHROEDER, POOLE and CANBY,* Circuit Judges.
 PER CURIAM:
 
 INTRODUCTION
 
 1
 Three of the appeals addressed in this opinion are taken from the District Court's decision ordering Clovis Unified School District to pay for the placement of real-party-in-interest Michelle Shorey in King's View Hospital as a residential placement under the Education for All Handicapped Children Act, 20 U.S.C. Secs. 1400 et seq. (Education of the Handicapped Act, EHA, the Act). Two of the appeals are taken from the District Court's order granting attorneys' fees to Michelle as a prevailing party in an action brought under 20 U.S.C. Sec. 1415(e). The primary issue for decision is whether Michelle's placement was a "related service" or excluded as a "medical service" under the Act. Because we find that Michelle was hospitalized for medical, rather than educational purposes, we reverse the orders of the District Court.
 
 STATUTORY BACKGROUND
 
 2
 The Education for All Handicapped Children Act of 1975, 20 U.S.C. Secs. 1400 et seq., provides funds and also regulates state assistance to handicapped students. Department of Education of the State of Hawaii v. Katherine D., 727 F.2d 809, 813 (9th Cir.1983), cert. denied 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 260 (1985). To qualify for federal assistance for special education programs, a state must have in effect a policy that assures all handicapped children the right to a "free appropriate public education." 20 U.S.C. Sec. 1412(1). The state must adopt policies and procedures which assure that all children receive an appropriate education "regardless of the severity of their handicap." 20 U.S.C. Sec. 1412(2)(C).
 
 
 3
 The term "free appropriate public education" is defined to include "special education" and "related services." 20 U.S.C. Sec. 1401(a)(18). "Related services" in turn are defined by the statute as
 
 
 4
 [T]ransportation and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only ) as may be required to assist a handicapped child to benefit from special education.... (emphasis added)
 
 
 5
 20 U.S.C. Sec. 1401(a)(17).[1] The Act contains no explicit definition of "medical services."
 
 
 6
 The EHA indirectly requires school districts to provide residential placements by defining elementary and secondary schools to include "residential schools." 20 U.S.C. Sec. 1401(a)(9) and (10). There is no further explanation in the Act, but the pertinent regulations provide that "[i]f placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. Sec. 300.302.
 
 
 7
 Under the Act an Individualized Educational Program (IEP) must be developed for each handicapped child. 20 U.S.C. Sec. 1401(a)(18). The program is developed by representatives of the educational agency, the teacher, the parents or guardians of the child, and when appropriate, the child. 20 U.S.C. Sec. 1401(a)(19).
 
 
 8
 The primary issue before us is whether Michelle Shorey's hospitalization at King's View Hospital constitutes either a "residential placement" or a "related service" which her local school district is required to pay for under the Act, or constitutes "medical services" excluded from the purview of the Act.
 
 FACTS AND PROCEEDINGS BELOW
 
 9
 Michelle Shorey is a seriously emotionally disturbed child who is entitled to special education and related services under the Education of the Handicapped Act, 20 U.S.C. Secs. 1400 et seq. At the time of this appeal she was ten years old. There is no dispute that Michelle requires a residential placement in order to receive an appropriate education. Clovis Unified School District ("Clovis" or "the district") is the local educational agency responsible under the EHA for providing Michelle with an appropriate education, including a residential placement at no cost to her parents. See 34 C.F.R. Sec. 300.302.
 
 
 10
 The Shoreys adopted Michelle at the age of 4 1/2. Apparently as a result of an extremely unstable and chaotic childhood, including neglect and abuse in eight or nine different placements before her ultimate adoption, Michelle developed serious emotional problems. When they adopted Michelle, the Shoreys lived in Washington state, where Michelle started public schooling.[2] When the adoptive parents moved to Riverside, California in 1984, they enrolled the child in a mental health day treatment program. Shortly thereafter, however, because of her destructive behavior, she was placed in a mental health residential treatment program. In January 1985 the Shoreys moved to Fresno, leaving Michelle in Riverside. Although Michelle continued to perform adequately in the classroom, her emotional condition deteriorated considerably.
 
 
 11
 In March 1985, the Mental Health Director of the Riverside facility informed the Shoreys that Michelle's behavior had deteriorated to such an extent that the staff could no longer control her, even with medication. The Riverside staff recommended placement in an acute care facility. The Shoreys applied for Michelle's admission to King's View Hospital, an acute care psychiatric hospital in Reedley, California. In mid-March Michelle was discharged from the Riverside facility and placed at King's View. The costs of her placement there were paid primarily through the Shoreys' private medical insurance until about July, when that coverage was exhausted.
 
 
 12
 During her first few months at King's View, personnel from Clovis Unified School District, the Shoreys' district of residence, attempted to locate an appropriate residential school for Michelle's educational placement. They considered and suggested a number of options, of which the most appropriate were the State Diagnostic School, a temporary residential placement, and Re-Ed West, a residential school located in Sacramento. The Shoreys rejected these suggestions, believing that neither could provide Michelle with an appropriate education.
 
 
 13
 Instead the Shoreys requested that Clovis fund Michelle's placement at King's View. When Clovis refused to do so, Michelle's parents sought an administrative hearing pursuant to the "procedural safeguards" provisions of the EHA, 20 U.S.C. Sec. 1415(b), and Cal.Educ.Code Sec. 56501, to determine whether she was entitled to be placed at Clovis' expense at King's View as a residential school placement under the Act. At the administrative hearing, the parents argued for placement at King's View at a cost of $150,000 per year; the school district argued for placement at Re-Ed West or the Diagnostic School, at a cost of approximately $50,000. The administrative hearing officer ruled in favor of Michelle, ordering the District to pay for her hospitalization from August 16, 1985, through the 1985-86 school year.
 
 
 14
 Clovis appealed the hearing officer's decision to the United States District Court for the Eastern District of California pursuant to Cal.Educ.Code Sec. 56505(j) and 20 U.S.C. Sec. 1415(e)(2), seeking injunctive and declaratory relief against Superintendent of Public Instruction William Honig and the California State Department of Education ("State Defendants"), the State Office of Administrative Hearings, Ronald Diedrich, the independent hearing officer, and Michelle. Clovis argued that placement at the hospital was for medical, rather than educational reasons, and that therefore the district was not obligated to fund such a placement. The State Defendants answered by admitting that the hearing officer's decision was erroneous. They have consistently supported Clovis' position throughout these proceedings.
 
 
 15
 Clovis first sought a temporary restraining order and a preliminary injunction under Cal.Educ.Code Sec. 56505(j). The motion for a TRO was denied on September 11, 1985; the District Court set the matter for trial on October 1, at which time it proposed to address both the preliminary injunction and the request for permanent relief.
 
 
 16
 Trial was delayed until March 18, 1986. In the interim, Clovis discovered that King's View had ties with the Mennonite church. Clovis moved to amend its complaint to add the issue of sectarian status. That motion, and a subsequent motion for reconsideration, were both denied by the District Court.
 
 
 17
 The District Court heard testimony at trial from those who knew or had occasion to interact with Michelle. The court ultimately ruled in favor of Michelle and ordered Clovis to pay all costs incident to her placement at King's View from August 16, 1985 through the 1985-86 school year. The court entered Findings of Fact and Conclusions of Law on June 17, 1986 and entered judgment on July 23. Following denial of their motion for a new trial and for amendment of the Findings of Fact and Conclusions of Law, Clovis and the State Defendants filed appeals. (No. 86-2747 and No. 86-2825). Michelle, whose counter-motion to amend Findings of Fact and Conclusions of Law was also denied, has cross-appealed. Michelle challenges the authority of the State Department of Education to seek to overturn the decision of the administrative hearing officer, and the failure of the District Court to extend her placement at King's View beyond the 1986 school year to which the administrative decision applied. (No. 86-2842).
 
 
 18
 On December 8, 1986, the District Court granted attorneys' fees to Michelle Shorey pursuant to 20 U.S.C. Sec. 1415(e)(4). Clovis and the State Defendants jointly appealed that award, challenging Congress's authority to create a retroactive right to attorneys' fees for prevailing parties in suits brought under 20 U.S.C. Sec. 1415. (No. 87-1537). Michelle cross-appealed, challenging the District Court's decision to award less than was requested without specifying the basis for the award. (No. 87-1554). The appeal and cross-appeal concerning attorneys' fees have been consolidated with the three appeals on the merits for disposition. We address all five related appeals in this opinion.
 
 THE "STAY PUT" PROVISIONS AND MOOTNESS
 
 19
 Michelle was at King's View throughout the 1985-1986 academic year pursuant to the August 16, 1985 order of the hearing officer and thereafter pursuant to the judgment of the district court. Under the "stay put" provisions of 20 U.S.C. Sec. 1415(e)(3), a child is to remain in "the then current educational placement of such child" during the pendency of review proceedings. At oral argument, on August 14, 1987, this court was informed that just a few weeks earlier, Michelle had returned from King's View to live with her family. We asked the parties to provide supplemental briefs on the application of the "stay put" provisions to this case, and second as to the issue of mootness in light of Michelle's move from King's View.
 
 
 20
 The principal issue to which the supplemental briefs were directed was whether the "stay put" provisions required Clovis to maintain the child in King's View throughout the course of the court review proceedings which followed the agency decision that King's View was the appropriate placement. 20 U.S.C. Sec. 1415(e)(3) provides as follows:
 
 
 21
 During the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents or guardians, be placed in the public school program until all such proceedings have been completed.
 
 
 22
 Clovis argues that under the stay put provisions the Shoreys should bear the King's View cost because the Shoreys originally placed the child at King's View on their own initiative. Clovis maintains it is irrelevant that the Shoreys won administrative and district court decisions holding that the placement was the appropriate one.
 
 
 23
 The Shoreys, however, argue persuasively that the school district and the state are responsible for the costs of Michelle's placement during the court review proceedings regardless of which party prevails in this appeal. They argue that the purpose and the language of the Act support a holding that Clovis, under the stay put provisions, was responsible for keeping Michelle in the King's View placement after the administrative decision that the placement was appropriate, and until a court directed otherwise.
 
 
 24
 The Shoreys' position is supported by the decision of the United States Supreme Court in School Committee of the Town of Burlington v. Massachusetts Department of Education, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The Supreme Court there considered a situation, like this one, in which parents had unilaterally changed a placement, but had received a state administrative agency decision in favor of their choice. The Supreme Court there said that the agency's decision in the parents' favor "would seem to constitute an agreement by the State to the change of placement." The Court refused to give the stay put provisions a reading that would force parents to leave a child in what they feel may be an inappropriate educational placement, or act at their peril in keeping a child in their chosen placement, after a successful administrative ruling. Burlington School Committee at 372-73, 105 S.Ct. at 2003-04. The Court took the view that once the State educational agency decided that the parents' placement was the appropriate placement, it became the "then current educational placement" within the meaning of section 1415(e)(3). Burlington concluded that the school was required to maintain that placement pending the court review proceedings pursuant to section 1415. We reach the same conclusion here. The district was responsible for maintaining the King's View placement through the pendency of court review proceedings.
 
 
 25
 The second question on which we asked for supplemental briefing was whether, because Michelle is no longer in King's View, the question of appropriate placement under the Act is moot. On this point, the parties agreed that it is not. Even though we have held that the district is responsible for the costs of her placement at King's View after the administrative decision, there remains in issue the responsibility for the costs prior to that decision. If the Shoreys are correct on the merits, then the district must pay for the King's View placement. If the district prevails on the merits of the placement issue, then the Shoreys are responsible for the costs from the time they unilaterally placed Michelle in King's View until the time of the administrative decision favorable to the Shoreys. See Burlington School Committee at 373-74, 105 S.Ct. at 2004-05. These appeals are therefore not moot as to the issue of the appropriateness of the placement under the EHA.
 
 RELATED SERVICE VS. MEDICAL EXCLUSION
 
 26
 Clovis agrees that Michelle's needs are such that a residential placement of some kind is necessary. See Kruelle v. New Castle County School District, 642 F.2d 687, 693-96 (3d Cir.1981); North v. District of Columbia Board of Educ., 471 F.Supp. 136, 139-41 (D.D.C., 1979). Nor does the district dispute that a highly structured and integrated program, offering regularly scheduled psychological services, including psychotherapy, is needed for Michelle to benefit from any educational program. Clovis also agrees that Michelle is entitled to state-supplied educational services while in the hospital, and those services are in fact provided by a local school district. Clovis asserts, however, that it is not obligated to pay for Michelle's hospitalization at King's View. It contends that the EHA does not require the school district to pay the costs of psychiatric hospitalization because that type of placement is a response to a medical rather than an educational need and is not the type of residential program contemplated by the Act. Clovis also contends that the intensive, extended psychological treatment Michelle receives at King's View is a "medical service" for which the school district is not financially liable under the Act, even if it is related to Michelle's education in the sense that she cannot fully benefit from her education without it. Hence, Clovis denies responsibility for Michelle's hospitalization, contending it is not the kind of "residential placement" or "related service" contemplated by the Act but is an excluded medical service.
 
 
 27
 The Shoreys, on the other hand, argue that Clovis is obligated under the EHA to pay King's View's fees because there is no other residential placement which can provide Michelle with the services she requires to benefit from her education. They note that the psychiatric treatment she receives is qualitatively the same as that provided in other residential placement centers or at day schools, and argue that therefore her treatment is not excludable as a "medical service."[3]
 
 
 28
 The question is one of law, which we review de novo. United States v. McConney, 728 F.2d 1195 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 The "Tatro" Decision
 
 29
 The leading case on excludable "medical services" is Irving Independent School District v. Tatro, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984). Tatro did not involve a residential placement, but its standards, though not dispositive, are helpful. That case involved an 8-year old girl who suffered from a neurogenic bladder and required insertion of a catheter into the urethra to empty her bladder every three or four hours. The Supreme Court held that the school nurse should perform that procedure as a "related service" under the EHA.
 
 
 30
 The Court based its decision, in part, on the fact the services did not have to be performed by a licensed physician. But the Court's decision was not based solely on the "licensed physician" distinction. The Court also supported its decision with a discussion of (1) the nature of the requested service and (2) the burden which it would place on the school district. With regard to the nature of the services, the Court explained that it was unable to distinguish between the services sought by the handicapped student and those routinely provided by the school nurse to non-handicapped students. It pointed out that even a trained lay person could have provided the services requested. Id. at 893-94, 104 S.Ct. at 3377-78. With regard to the burden, the Court began by recognizing that the genesis of the medical services exclusion was partly based on Congress' intent to "spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." Id. at 892, 104 S.Ct. at 3377. It noted that the "services provided by a physician or hospital," which are excluded, are "far more expensive" than the services of a school nurse. Id. at 893, 104 S.Ct. at 3377.
 
 
 31
 Both parties argue that they should prevail under the analysis in Tatro. The parties agree that Michelle is handicapped. They dispute whether the services provided to Michelle at King's View are necessary to aid her to benefit from special education or, as Clovis contends, primarily aimed at meeting her medical needs. They also dispute the extent to which the "licensed physician" distinction should control.
 
 
 32
 The Shoreys suggest that the only relevant inquiry under Tatro is whether the placement is supportive of a handicapped child's education. We think this test is far too inclusive, however, in light of the Act's explicit exclusion of medical services. If a child requires, for example, ear surgery to improve his hearing, he may learn better after a successful operation and therefore in some respects his surgery is "supportive" of his education, but the school district is certainly not responsible for his treatment. Similarly, a child who must be maintained on kidney dialysis certainly cannot physically benefit from education to the extent that such services are necessary to keep him alive, but again, it is not the responsibility of the school district to provide such maintenance care. See McKenzie v. Jefferson, 566 F.Supp. 404, 413 (D.D.C.1983) ("If [a schizophrenic child] had not been medically treated, she would have been unable to take advantage of and receive any benefit from her education, but the same would apply to any illness"). All medical services are arguably "supportive" of a handicapped child's education; therefore, mere "supportiveness" is too broad a criterion to be the test for whether a specific service is necessary under the Act to assist a child to benefit from special education.
 
 
 33
 Similarly, we reject the line of reasoning proferred in Vander Malle v. Ambach, 667 F.Supp. 1015, 1039 (S.D.N.Y.1987), that where "medical, social or emotional problems that require hospitalization create or are intertwined with the educational problem, the states remain responsible" for the entire cost of the placement. Rather, our analysis must focus on whether Michelle's placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process. See Kruelle v. New Castle County School District, 642 F.2d at 693; Corbett v. Regional Center for the Easy Bay, Inc., 676 F.Supp. 964, 968-69 (N.D.Cal.1988); McKenzie v. Jefferson, 566 F.Supp. at 408, 412; North v. District of Columbia Board of Educ., 471 F.Supp. at 160.
 
 
 34
 Medical Services Exclusion And The "Licensed Physician" Distinction
 
 
 35
 The Shoreys do not deny that Michelle's program is in part therapeutic, but argue for a narrow definition of medical services, contending that, under Tatro, medical services are only those services that must be provided by a licensed physician. They believe that the services which Michelle is provided at King's View are necessarily not excluded because, while some treatment is on that scale, not all of the services are provided by physicians.
 
 
 36
 We cannot agree. A number of District Courts have faced this issue and have concluded that the "licensed physician" distinction is inadequate as the sole criterion for determining when services fall under the medical exclusion from liability. In Max M. v. Thompson, 592 F.Supp. 1437 (N.D.Ill.1984), the District Court held that psychotherapy, a recognized related service under the Act, does not become excluded as a medical service merely because it is provided by a psychiatrist--a licensed physician--rather than by a psychologist. We agree with the reasoning of this opinion, and with its rejection of an arbitrary classification of services based solely on the licensed status of the service provider. If a licensed physician may provide related services without their becoming instantly "medical," we believe that by the same token a program clearly aimed at curing an illness--whether mental or physical--does not become instantly "related" when it can be implemented by persons other than licensed physicians.
 
 
 37
 The post-Tatro case of Detsel v. Board of Education of Auburn, 637 F.Supp. 1022 (N.D.N.Y.1986), aff'd 820 F.2d 587 (2d Cir.), cert. denied, 484 U.S. 981, 108 S.Ct. 495, 98 L.Ed.2d 494 (1987), is even more on point. There a district court found that intensive life support services necessary to maintain a child in school fell outside the "related services" mandated by the Act and "more closely resemble[d] the medical services specifically excluded by Sec. 1401(17) of the [EHA]," despite the fact that the services could be provided by a practical nurse rather than by a physician. Id. at 1027. Applying the principles of Tatro, the court found that holding the school district responsible for the provision of such "extensive, therapeutic health services" would be contrary to the rationale of the medical services exclusion in the Act, based as it is upon relieving schools of the obligation to provide services calculated to be unduly expensive. Id.
 
 
 38
 We agree with the Detsel court, that under the analysis in Tatro, the Shorey's argument for limiting medically excluded services to those requiring a physician's intervention must fail. The Court in Tatro did not hold that all health services are to be provided as related services so long as they may be performed by other than a licensed physician. 468 U.S. at 891-95, 104 S.Ct. at 3376-78; see also Detsel, 637 F.Supp. at 1027. Rather, the Court held only that services which must be provided by a licensed physician, other than those which are diagnostic or evaluative, are excluded and that school nursing services of a simple nature are not excluded. In reaching this decision the Court considered the extent and nature of the services performed, not solely the status of the person performing the services. We must do the same.
 
 
 39
 Despite the Shoreys' arguments, we see no reason why the "licensed physician" distinction should take on special significance in cases, such as this, which involve intensive psychological rather than physiological disability. A child hospitalized for ear surgery or kidney dialysis who, the Shoreys concede, is not entitled to subsidy of the costs of hospitalization, frequently must receive care by other than licensed physicians. The services of hospital nurses, dieticians, physical therapists, orderlies and other aids constitute integrated medical services in the treatment of a physical illness requiring the "medical" intervention of licensed professionals. Clearly all such services, including the strictly medical or surgical services themselves, "support" a child's education. But it would do havoc to the structure of the Act to exclude only the services of licensed physicians in such circumstances, and to require the school district to pay for all other services. At oral argument, the Shoreys conceded that the services of the aforementioned hospital personnel are excluded as medical, not because they are provided by doctors (because they are not), but rather because their institutional efforts are involved in the curing of a physical illness.
 
 
 40
 However, the Shoreys assert that when a child is psychologically or psychiatrically handicapped, as distinguished from a child who suffers a physical handicap, there is no single point at which the needs of the child become medical. They argue that a continuum of educational needs dictates that school districts must pay for the psychiatric hospitalization of such children under the Act's mandate to provide related services to all children "regardless of the severity of their handicap." 20 U.S.C. Sec. 1412(2)(C). According to the Shoreys, this continuum of needs exists, and a child's educational needs remain unsegregable from her needs for treatment (and thus by hypothesis "related") unless or until those needs must be addressed by licensed physicians.
 
 
 41
 We cannot accept as reasonable a definition of "medical" which ultimately turns on the distinction between physiological illness and mental illness. Such a definition would mandate huge expenditures by local school boards aimed at "curing" psychiatric illness but not require similar expenditures for treating children with physical problems who require the more traditional "medical" services. The clear intention of the Act is to provide access to education for all handicapped students on an equal basis. Section 1412(2)(B) precludes such an unfair result. 20 U.S.C. Sec. 1412(2)(B).
 
 APPLICATION OF THE ACT TO THIS CASE
 
 42
 With these considerations in mind, we turn now to an examination of the case before us. We find that the psychiatric hospitalization of Michelle Shorey, although perhaps necessary for her continued mental health, was not the financial responsibility of the Clovis Unified School District under the Act.
 
 A. Services Provided at King's View
 
 43
 Michelle was hospitalized at King's View because of an "acute" psychiatric crisis. Her wild and destructive rages rendered her not only unable to benefit from education, but, indeed, generally uncontrollable.
 
 
 44
 At King's View, Michelle's program consisted of a residential/therapeutic program coordinated with an on-grounds classroom program. She spent her day in a variety of therapy programs including individual therapy, pottery, and animal care. These therapies were provided by various persons who met the state licensing or training requirements for hospital medical staff. Psychiatric nurses supervised the "residential" component of Michelle's program and were trained to complement her total treatment program. By law, a licensed physician, though not necessarily the primary treating physician, was required to supervise Michelle's overall treatment program. On the other hand, none of Michelle's therapy was actually provided by psychiatrists, nor did she require the prescription of psychotropic medication.
 
 
 45
 Because school districts are required by state law to provide education to school-aged patients confined to hospitals, see Cal.Educ.Code Sec. 56167, King's Canyon Unified School District provides classroom instructors, both regular and special education teachers, to meet the educational needs of children in King's View. Michelle received approximately one to two hours per day of classroom instruction during her time at King's View. Michelle's program at the hospital was implemented not by the Individualized Education Program (IEP) designed by the school system, but was instead determined by a medical team, supervised by a licensed physician. The amount of time spent in the classroom was determined by the hospital staff, and dependent upon her other treatment needs.
 
 
 46
 B. The Services Are Not Primarily To Aid Michelle To Benefit From Special Education But Rather Are Excludable Medical Services
 
 
 47
 Michelle was hospitalized primarily for medical, i.e. psychiatric, reasons, and therefore the District Court erred when it determined hospitalization to be a "related service" for which Clovis was responsible under the Act.
 
 
 48
 The psychotherapeutic services Michelle received at King's View may be qualitatively similar to those she would receive at a residential placement, and it is clear that some psychological services are explicitly included within the definition of related services under the Act when pupils need such services to benefit from their special instruction. However, the intensity of Michelle's program indicates that the services she received were focused upon treating an underlying medical crisis. Where, as here, a child requires six hours per day of intensive psychotherapy, such services would appear "medical" in that they address a medical crisis.
 
 
 49
 Further, although Michelle could be helped by treatment by psychologists rather than psychiatrists, it stands to reason that the high cost of her placement is due to the status of King's View as a medical facility, requiring a staff of licensed physicians, a high staff to patient ratio, and other services which would not be available or required at a placement in an educational institution. While the cost of medical and hospital services is not dispositive, the Court in Tatro noted that the Secretary of Education, in promulgating the regulations, excluded "the services of a physician or hospital" partly because such services are "far more expensive" than the services, for example, of a school nurse. Tatro, 468 U.S. at 893, 104 S.Ct. at 3377. Clearly hospital care is, and was understood by Congress and Secretary of Education to be, a far more expensive proposition than an educational residential placement and a greater burden than the states could ordinarily be expected to shoulder in their budgets for education.
 
 
 50
 This conclusion is also supported by the failure of Congress to include hospitalization explicitly as a related service or placement under the Act. As the Supreme Court wrote in Pennhurst State School v. Halderman, 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1982) "[i]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." Similarly, in Board of Education v. Rowley the Court found that the EHA does not require states to maximize the potential of each handicapped child, noting that any other view would be "contrary to the fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the states unless it does so unambiguously." 458 U.S. 176, 190 n. 11, 102 S.Ct. 3034, 3042 n. 11, 73 L.Ed.2d 690 (1981). We, too, recognize the unfairness of requiring school districts to pay for hospitalization on the basis of broad interpretations of ambiguous language in funding statutes such as the EHA.
 
 
 51
 Our decision is further supported by the state's characterization of hospitals such as King's View. Under section 1412(6) of the Act, the state educational agency is responsible for assuring that "all educational programs for handicapped children ... shall meet education standards of the State educational agency." Thus the underlying policies which direct the establishment of individualized educational programs and their implementation are left to the discretion of educators and parents within the state. See Board of Education v. Rowley, 458 U.S. at 208-09 nn. 30, 31, 102 S.Ct. at 3051-52 nn. 30, 31. In California, hospitals such as King's View come under the jurisdiction of the State Department of Health Services.[4] They are not included as educational placement options for handicapped pupils in that state. See Cal.Educ.Code Secs. 56360, 56167. The District Court was not free to substitute its own standards for educational programs for those of the state. See Doe v. Anrig, 651 F.Supp. at 430 (school district not financially responsible for placement at a psychiatric hospital as institution was not a state approved special education facility); Darlene L. v. Illinois State Board of Education, 568 F.Supp. 1340, 1345-46 (N.D.Ill.1983) (upholding a state regulation excluding psychiatric hospitals as placement options for handicapped pupils under the Act.)
 
 
 52
 Furthermore, King's View hardly provided Michelle with any educational services. Rather, the local school district sent both regular and special education teachers to King's View to meet the educational needs of Michelle and other children who were patients there. Because King's View does not provide its patients with educational services, it differs substantially from facilities found by other circuits to be residential placements within the ambit of 34 C.F.R. Sec. 300.302 for which school districts are financially responsible. In Jefferson County Board of Education v. Breen, 853 F.2d 853, 857 (11th Cir.1988), the Eleventh Circuit required a school district to pay for a child's placement at The Ranch, a Brown school, as the school had the facilities to provide the child with an integrated program of educational and other supporting services. The Breen court expressly refused to place the child in a psychiatric hospital, finding that such a placement was inappropriate under the Act as the hospital lacked the facilities to provide the child with an appropriate education. Id. Similarly, the Sixth Circuit in Clevenger v. Oak Ridge School Board, 744 F.2d 514 (6th Cir.1984), required the school district to pay for the placement of a seriously emotionally disturbed youth at San Marcos School, a Brown school, on the grounds that the school could meet the child's educational and related needs. Id. at 516. The absence of educational services provided by King's View indicates that the room and board were medically as opposed to educationally related. They were thus outside the purview of 34 C.F.R. Sec. 300.302 which provides that where "placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program including non-medical care and room and board, must be at no cost to the parents." (Emphasis added).
 
 
 53
 In fact, the educational services which the school district provided Michelle at King's View are those encompassed by the Act itself which states that "special education" includes specially designed instruction at home, at hospitals and at institutions. 20 U.S.C. Sec. 1401(16). In enacting this provision, Congress sought to ensure that children confined to hospitals or homes for either physical or mental illnesses would not be denied an education. School districts, therefore, are required to send tutors and other trained specialists to both homes and hospitals to meet the educational needs of handicapped children. However, section 1401(16) does not require school districts to pay the costs of a child's room and board at home and similarly does not require them to pay the room and board costs at a hospital.
 
 
 54
 Michelle may well be entitled to funds from other social agencies to cover the costs of her hospitalization, but the school district is not the proper agency for such relief.
 
 OTHER ISSUES
 
 55
 Some brief mention must be made of the other issues presented in the appeals on the merits.
 
 Sectarian Status Of King's View
 
 56
 The federal regulations governing the use of federal grant monies for education explicitly prohibit the use of such funds for religious purposes. 34 C.F.R. Sec. 76.532. Similarly, California prohibits the state from contracting with a sectarian hospital for instructional services. Cal.Educ.Code Sec. 56361.5(a).
 
 
 57
 At trial Clovis moved to amend its pleading and offer testimony on the issue of King's View's affiliation with the Mennonite church. At that time, the District Court denied the motion and excluded Clovis' proffered testimony relating to the decertification, considering the matter one for decision by the state courts. In its letter decertifying King's View, the State Department of Education wrote that Michelle "may remain [at King's View] pending the outcome of the litigation" because "[t]he Department does not believe it is wise to administratively decide an issue that is properly before the court" and "federal law appears to disallow any interference with a Hearing Officer's decision by the state agency, except by appeal to a court of competent jurisdiction." In its final judgment, the District Court effectively determined the issue to have been mooted by the Superintendent's decision not to move Michelle. We agree.
 
 The Shorey Cross-Appeal
 
 58
 At trial, the District Court indicated that, because its decision constituted an appeal from the administrative hearing in this case, it could not order placement beyond the end of the 1985-86 school year to which the administrative hearing officer's decision applied. In their cross-appeal, the Shoreys contend that the District Court erred in failing to grant their motion to amend the judgment to extend Michelle's placement. Because we reverse the order of the District Court ordering Clovis to pay for Michelle's placement while at the same time we require the school district to pay for such placement during the pendency of the review proceedings under the stay-put provisions of 20 U.S.C. Sec. 1415(e)(3), we need not decide whether there was any error in the failure of the District Court to extend that placement for another year.
 
 
 59
 The Shoreys also contend that the state defendants, in aligning themselves with appellant Clovis in this action, have violated EHA's requirements of finality and impartiality, 20 U.S.C. Sec. 1415(b)(2) and (e)(1), by "renouncing and seeking to overturn [their] own decision." This argument is meritless. Under the EHA, parents must be accorded the right to take disputes as to the identification, assessment, and placement of handicapped children to an impartial due process hearing. 20 U.S.C. Sec. 1415. States are accorded the option of providing either for hearings by a local or intermediate educational agency with review by a state agency, or for a single hearing by a state level agency. Impartiality is ensured by the requirement that the hearing may not be conducted by an employee of an agency which is either directly or indirectly involved in the education or care of the child. 20 U.S.C. Sec. 1415(b)(2); Robert M. v. Benton, 634 F.2d 1139, 1141-42 (8th Cir.1980). California has implemented a system of single, state level hearings. Although the State Department of Education in this case is in the seemingly unique position of challenging an administrative determination rendered in its name by an independent hearing officer, the Office of Administrative Hearings in this case is not an employee of the State Department of Education and there is no indication that his decision in this case was not "impartial."
 
 
 60
 Under the EHA, the decision of the hearing officer is final and enforceable unless appealed. 20 U.S.C. Sec. 1415(e)(1) and (3). It has been treated as such in this case. The state defendants have simply aligned themselves with Clovis, which properly brought this appeal. In short, neither the impartiality of the administrative decision nor its finality are threatened by the state defendants' posture in this case.
 
 Attorneys' Fees Award
 
 61
 In view of our disposition on the merits of the case, it is apparent that Michelle Shorey was not a prevailing party and therefore was not entitled to attorneys' fees under 20 U.S.C. Sec. 1415(e)(4).
 
 
 62
 The judgment of the District Court is REVERSED. The order granting attorneys' fees to Michelle is also REVERSED. Each party will bear its own costs on appeal.
 
 
 
 *
 Honorable William C. Canby was drawn to replace Russell E. Smith, Senior United States District Judge, now deceased
 
 
 [1]
 The comments accompanying 34 C.F.R. Sec. 300.13 indicate that "[t]he list of related services is not exhaustive and may include other developmental, corrective, or supportive services (such as artistic and cultural programs, and art, music, and dance therapy), if they are required to assist a handicapped child to benefit from special education."
 
 
 [2]
 Emotional difficulties led to Michelle's hospitalization for two months in October, 1983
 
 
 [3]
 No party has ever raised in this litigation the possibility of separating the costs of the "educational" services from the costs of the "medical" services provided at King's View in order to apportion them among the parties. See, e.g., Drew P. v. Clarke County School Dist., 877 F.2d 927, 929 (11th Cir.1989) (costs of residential placement apportioned between school district and parents); Doe v. Anrig, 651 F.Supp. 424, 430-32 (D.Mass.1987) (court apportioned costs between school district and father). We address no such issues
 
 
 [4]
 We note that there is nothing magical about the appellation "hospital" in our analysis. There are many public institutions around the nation which are called "state hospitals" that are in fact primary residential treatment facilities where the educational, social, and developmental training needs of severely handicapped individuals are met. For example, in California the legislature has established eight "State Hospitals for the Developmentally Disabled." See Cal. Wel. & Inst.Code Sec. 7500. These institutions are not primarily medical hospitals, but are more like residential treatment centers where an individual's multiple and intertwined needs can be met. The object of these "hospitals" is the "care, treatment, habilitation, training, and education" of the persons committed thereto, Cal. Wel. & Inst.Code Sec. 7503, and may well qualify, under state law, as residential placements with which school districts may contract under the Act. That question is not before us, and we express no opinion on it. We simply emphasize that King's View is quite distinguishable from such state institutions. Psychiatric hospitals, under California law, are not responsible for the "training" or "education" of their patients, but for their medical care. See Cal. Health and Safety Code Sec. 1250(b) and 1250.2(a); Chapter 2, Article 3, Title 22 Cal.Admin.Code. Secs. 71201 et seq