PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3008
_____

MUHAMMAD MUNIR, Individually
and as the parent of minor plaintiff, O.M.,
                                    Appellant

v.

POTTSVILLE AREA SCHOOL DISTRICT
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-10-cv-00855)
District Judge:  Honorable Robert D. Mariani
_____

Submitted Under Third Circuit LAR 34.1(a)
June 13, 2013

Before:  SCIRICA, HARDIMAN and
ALDISERT, *Circuit Judges*.

(Filed: July 25, 2013 )

Albert J. Evans
Fanelli, Evans & Patel
1 Mahantongo Street
Pottsville, PA 17901-0000
  *Attorneys for Plaintiff-Appellant*

Kimberly A. Boyer-Cohen
John J. Hare
Marshall, Dennehey, Warner, Coleman & Goggin
2000 Market Street
Suite 2300
Philadelphia, PA 19103

Christopher J. Conrad
Sharon M. O'Donnell
Marshall, Dennehey, Warner, Coleman & Goggin
4200 Crums Mill Road
Suite B
Harrisburg, PA 17112
  *Attorneys for Defendant-Appellee*

_____

OPINION OF THE COURT
_____

HARDIMAN, *Circuit Judge*.

This case arises under the Individuals with Disabilities Education Act (IDEA), a federal statute requiring states that receive federal education funding to ensure that disabled children receive a "free appropriate public education" (FAPE). 20 U.S.C. § 1412(a)(1). The statute "protects the rights of

2

disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (quoting *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009)). Appellant Muhammad Munir sent his son, O.M., to a private residential facility and a private boarding school following multiple suicide attempts, and sought reimbursement for the cost of those placements from the Pottsville Area School District (Pottsville or School District). For the reasons that follow, we will affirm the District Court's order denying that request.

I

To comply with the IDEA, school districts must identify and evaluate all children who they have reason to believe are disabled under the statute. *D.K.*, 696 F.3d at 244. Once a school district has identified a child as eligible for IDEA services, it must create and implement an Individualized Education Plan (IEP) based on the student's needs and areas of disability. *P.P.*, 585 F.3d at 729–30. School districts are not, however, required to "maximize the potential" of each handicapped student. *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 577 (3d Cir. 2000) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21 (1982)). Instead, to satisfy the IDEA, the district must offer an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *P.P.*, 585 F.3d at 729–30 (quoting *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)); *see also Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235,

3

240 (3d Cir. 2009) (explaining that once the school district has designed and administered an IEP that is reasonably calculated to enable the receipt of meaningful educational benefits, it has satisfied its obligation to provide the child with a FAPE).

If parents believe that the school district is not providing a FAPE for their child, they may unilaterally remove him from the school, enroll him in a different school, and seek tuition reimbursement for the cost of the alternative placement. *Id.* at 242 (citing 20 U.S.C. § 1412(a)(10)(C) and *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374 (1985)). Parents who change their child's placement without the consent of state or local officials, however, "do so at their own financial risk." *Burlington*, 471 U.S. at 373–74. A court may grant the family tuition reimbursement only if it finds that the school district failed to provide a FAPE and that the alternative private placement was appropriate. *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993); *Mary T.*, 575 F.3d at 242. Courts also have broad discretion to consider equitable factors when awarding tuition reimbursement. *Florence Cnty. Sch. Dist.*, 510 U.S. at 15–16.

II

A

O.M. is a 21-year-old former Pottsville student who was diagnosed as suffering from emotional disturbance. He first required in-patient hospital treatment for making threats of suicide and suicidal gestures in 2005, when he was enrolled in middle school. At that time, the School District conducted a psycho-educational evaluation to determine whether O.M. suffered from a learning disability and would be eligible for

4

IDEA services. It determined that O.M. was not eligible for learning disability services based on his cognitive and achievement test scores. It determined that he was not eligible for emotional disturbance services based on behavioral ratings completed by teachers and a psychiatric report.

O.M. returned to Pottsville in the fall of 2005 and performed well academically for three years. He had no problem with attendance, expressed no concerns about school, and received grades in the A to C range in regular college preparatory courses.[1] During the 2005-2006 school year, O.M. periodically saw the school psychologist, who observed nothing suggesting that an additional evaluation for IDEA services was necessary.

In April 2008, O.M. took an overdose of prescription medication and was hospitalized. Although his parents notified the School District about the incident, they did not provide it with details or medical records. O.M. also was hospitalized twice in the summer of 2008 for making suicidal threats and gestures and attempting suicide. The first hospitalization occurred after an incident with his high school football coach during a summer practice session; the second occurred during a family trip to the university that O.M.'s sibling attended.

Following the very difficult summer O.M. experienced, in August 2008, O.M.'s parents notified the School District that they were going to enroll him in the private boarding school that his brother had attended. The School District assisted in this

---

[1] In the 2007-2008 school year, for example, O.M. received two A's, three B's, and two C's.

effort by writing letters of recommendation for O.M. and supplying teacher evaluation forms. O.M.'s guidance counselor, who submitted a very positive letter of recommendation, noted that O.M. was ranked 62 out of a class of 278. O.M. was accepted, but after his first day the boarding school notified his parents that he felt depressed and had thoughts of harming himself, and it required his parents to take him home.

After his withdrawal from boarding school, O.M. reenrolled at Pottsville Area High School. His behavior and performance at school were, for the most part, unremarkable. He initially decided to take honors math classes, but began struggling academically and dropped them. When he returned to regular college preparatory courses, his grades improved. On at least two occasions after O.M. returned, he became upset and spoke to the guidance counselor, and his parents were required to pick him up from school. Otherwise, O.M. generally attended and participated in his classes, and he was observed spending his lunch and free periods socializing with students who were considered popular.

O.M.'s mental health problems continued, however. In early September 2008, he again expressed suicidal ideation and had to be hospitalized. His parents notified the School District and requested an IEP for their son. In response, the School District requested and received permission from O.M.'s parents to conduct an evaluation to determine whether he was a protected handicapped student under § 504 of the Rehabilitation Act, and, if so, what services he needed.[2] O.M. was hospitalized

---

[2] The Rehabilitation Act "prohibits discrimination in federally-funded programs, including public schools, on the

6

again in November 2008. In mid-November, the School District created a Rehabilitation Act § 504 plan for O.M., which O.M.'s parents approved.[3] The School District did not, however, create an IEP.

In January 2009, O.M. again threatened suicide and was hospitalized for treatment. When he was released, his parents enrolled him at Wediko Children's Services, a therapeutic residential treatment center in New Hampshire, for the rest of the school year. While there, O.M. received daily individual and group therapy, during which he received training in social skills, emotional regulation, stress management, and conflict resolution. Wediko also offered a full school day with a curriculum that met New Hampshire's educational standards, which O.M. began attending about two to three weeks after his enrollment. The classes were small and graded on a pass-fail basis, and the school day included three debriefing periods to assess how well O.M. was maintaining control of his thoughts, mood, and anxiety.

---

basis of disability." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 265 n.1 (3d Cir. 2012) (citing 29 U.S.C. § 794).

[3] O.M.'s § 504 plan provided for the following services and accommodations: positive reinforcement from teachers; preferential seating; directions repeated verbally; extra time to complete time-sensitive tasks when needed; and permission to take tests in a quiet setting when needed. The plan also provided that O.M. would ask for help from teachers and use available tutoring services and guidance services when necessary.

Wediko conducted an evaluation of O.M. in February 2009. The evaluation consisted of standardized cognitive and academic achievement tests and measures designed to test social-emotional functioning. Wediko notified the School District of the results and recommended that the District consider an IEP for O.M. The District reviewed Wediko's analysis, which indicated that O.M. was in the average range of intellectual functioning, with average to above average scores in math, reading, and writing, and accepted Wediko's diagnosis of emotional disturbance.[4]

In May 2009, the School District offered an IEP for O.M., which included annual goals and provided for emotional support services. In September 2009, the School District added a cognitive-behavioral curriculum for students experiencing anxiety and depression. It also increased social work services and added psychological services. Although these proposals incorporated most of Wediko's recommendations, O.M.'s parents rejected the IEP because it did not provide O.M. with small classes or the same types of counseling services that he was receiving at Wediko. O.M. completed the school year at Wediko.

Before the start of the 2009-2010 school year, O.M.'s parents decided that his risk level had decreased to the point where he could function in a less intensive environment. Accordingly, O.M.'s parents decided to send him to The Phelps School, a residential school located in Malvern, Pennsylvania, and licensed by the Pennsylvania Department of Education.

---

[4] The School District rejected Wediko's conclusion that O.M. had a non-verbal learning disability.

Phelps was closer to home and offered small classes and a supportive environment.

B

O.M.'s parents filed a due process complaint in August 2009 with the Office of Dispute Resolution, and a hearing was conducted by a Pennsylvania Special Hearing Officer. O.M.'s parents alleged that the School District had failed to conduct a timely evaluation of O.M. and provide specialized educational services, in violation of the IDEA. They sought: (1) compensatory education for the time period between the fall of 2007 and December 2008; and (2) reimbursement for the cost of O.M.'s placements at Wediko and Phelps.

The Hearing Officer issued a written administrative decision and order denying relief on January 23, 2010. She concluded that the School District had no obligation to evaluate O.M. or provide him with specialized educational services between 2005 and spring of 2008 because, although the record suggested that O.M. was emotionally disturbed, there was no evidence that O.M.'s condition was affecting his ability to learn at that time. The Hearing Officer remarked that whether the School District had an obligation to evaluate O.M. and provide him with specialized services in the fall of 2008, after it learned of his September and November suicide attempts, was a closer question. Nevertheless, she determined that even if the School District had committed a procedural violation of the IDEA, that violation had no substantive effect, as O.M. was placed at Wediko before the School District would have had time to complete an evaluation, develop an IEP, and begin to provide services. Because the School District's delay did not actually deprive O.M. of an educational benefit, O.M. was not entitled to

an award of compensatory education for that period.

The Hearing Officer then considered whether O.M.'s parents were entitled to compensation for the costs of private placement at Wediko or Phelps. Relying on *Mary T. v. School District of Philadelphia*, 575 F.3d 235 (3d Cir. 2009), she determined that they were not entitled to reimbursement for the costs of attending Wediko because the primary purpose of that placement was the provision of mental health treatment rather than provision of special education. She explained that O.M. was placed at Wediko because of "a medical/mental health crisis that required immediate treatment." App. 59. This finding was supported by the testimony of O.M.'s father and witnesses from Wediko, who "emphasized that Student needed to attend Wediko in order to keep him safe from the effects of his depression, which led to suicide threats and gestures when he was living at home." App. 60. She also noted that the services O.M. received while at Wediko were based on a treatment plan designed by a clinical psychologist and were not focused primarily on education.

Finally, the Hearing Officer determined that O.M.'s parents were not entitled to compensation for the costs of attending Phelps because, at the time that O.M. went there, the District had proposed an IEP that met all of O.M.'s educational needs. Although O.M.'s parents opined that O.M. could benefit from smaller class sizes and counseling services such as those provided by the private schools, the Hearing Officer explained that, under the IDEA, O.M. "is entitled to an appropriate program, not an ideal program." App. 60.

On April 21, 2010, Munir appealed the Hearing Officer's decision by filing a complaint in the United States District Court

for the Middle District of Pennsylvania. The District Court adopted the factual findings of the Hearing Officer, applied the same legal analysis, and granted summary judgment in favor of the School District.[5] Munir filed this timely appeal, challenging only the District Court's denial of his request for tuition reimbursement.

## III

The District Court had jurisdiction in this matter under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A). We have jurisdiction pursuant to 28 U.S.C. § 1291.

In deciding cases brought under the IDEA, district courts apply a modified version of de novo review. *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). Although the District Court must make its own findings by a preponderance of the evidence, it is also required to afford due weight to the factual findings of the hearing officer. *Id.* "The 'due weight' standard requires the court to consider the factual findings from the administrative proceedings prima facie correct and, if the court fails to adopt those findings, it must explain its reasons for departing from them." *Mary T.*, 575 F.3d at 241 (quoting *Shore*,

---

[5] During the District Court proceedings, both Munir and the School District supplemented the administrative record with their own reports as to whether the IEPs offered by the School District were adequate. The District Court found that these reports "amounted to little more than a quasi-judicial type review of the administrative findings," and provided no "basis to abrogate the findings of fact listed by ALJ Carroll in her Decision." App. 27.

11

381 F.3d at 199) (internal quotation marks and alterations omitted). We exercise plenary review over the District Court's legal conclusions and review its factual findings for clear error. *L.E.*, 435 F.3d at 389.

IV

On appeal, Munir argues that he is entitled to reimbursement for the costs of O.M.'s tuition at Wediko and Phelps. To be entitled to reimbursement, Munir must show that the School District failed to provide O.M. with a FAPE and that the alternative private placement was appropriate. *See Florence Cnty. Sch. Dist.*, 510 U.S. at 15–16; *Mary T.*, 575 F.3d at 242. For placement at a residential program to be "appropriate," the program must itself be proper under the IDEA—that is, it must "provide[] significant learning and confer[] meaningful benefit." *Mary T.*, 575 F.3d at 242 (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007)). The court must also find that the residential program is the sort of program that the public school should have taken financial responsibility for in the first place. *See, e.g.*, *id.* at 243–44 (considering whether the school district should have initially been financially responsible for the placement in determining whether a placement was "appropriate" for purposes of reimbursement); *see also Butler v. Evans*, 225 F.3d 887, 894 (7th Cir. 2000) (same).[6]

---

[6] We have previously recognized that "parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA." *Mary T.*, 575 F.3d at 242 (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 n.8 (3d Cir. 1999)). A private placement may, for example, be "appropriate"

12

The District Court determined that Munir was not entitled to reimbursement for the costs of O.M.'s attendance at Wediko because he could not meet the second prong of the test. That is, O.M.'s placement at Wediko was not an "appropriate" placement because he was placed at Wediko to treat his mental health needs, and any educational benefit that he received was incidental. The Court further determined that Munir was not entitled to reimbursement for the costs of attending Phelps because the first prong of the test had not been met—when O.M. was enrolled at Phelps, the School District had offered him an IEP that would meet his educational needs. Because we perceive no error in the Hearing Officer's comprehensive decision or in the District Court's thorough review of the case, we will affirm.

A

O.M.'s parents enrolled him at Wediko in January 2009, after he received in-patient treatment following a suicide attempt, and O.M. stayed at Wediko through July 2009. Munir seeks reimbursement for the costs of this placement, which amounted to $68,752.61.

---

even if the private school fails "to provide an IEP or meet state educational standards." *Id*. at 242 (citing *Florence*, 510 U.S. at 14–15). But if a school district would not have been required to provide the child with residential treatment before the child was withdrawn from public school, it does not become financially responsible for that placement when parents make the unilateral decision to enroll their child at a residential facility. This is true even when the school district may have failed in some other respect to provide the child with a FAPE.

Munir argues that the School District violated the procedures set out by the IDEA when it failed to offer O.M. an IEP until May 2009,[7] and that the IEP the School District offered then was inadequate. He argues that, as a result of the School District's violations, O.M. was denied a FAPE during the 2008-2009 school year. He further claims that full-time residential treatment was a "necessary ingredient to learning," so O.M.'s placement at Wediko from January 2009 to July 2009 was "appropriate." Munir Br. at 52.

School districts are responsible for the costs of a disabled child's placement in a residential program when that placement is "necessary to provide special education and related services." 34 C.F.R. § 300.104. Residential placement may be necessary when the disabled child needs a highly structured environment in order to obtain any kind of educational benefit. For example, in *Kruelle v. New Castle County School District*, 642 F.2d 687 (3d Cir. 1981), we explained that the appropriate educational goals for a child with severe mental disabilities and cerebral palsy included the development of "basic self-help and

---

[7] Munir contends that the School District should have identified O.M. as disabled "as early as 2005, and no later than September of 2008" because of his hospitalizations. Munir Br. at 34. But Munir did not present any evidence that O.M.'s condition adversely affected his educational progress during that time. Indeed, as the Hearing Officer noted, Munir testified that O.M. had no problem with attendance and did not express any concern about attending school during that period. Munir also argues that that the School District had an obligation to evaluate O.M. and develop an IEP at some point after September 2008, when he requested an evaluation.

social skills such as toilet training." *Id*. at 693 (quoting *Battle v. Commonwealth of Pa.*, 629 F.2d 269, 275 (3d Cir. 1980)). However, the child suffered from emotional problems that prevented him from achieving those goals; when he experienced stress, he would induce choking and vomiting, which "interfere[d] fundamentally with his ability to learn." *Id*. at 694. The student needed consistency of programming and environment to meet his educational goals because of his emotional problems, and we thus found that the school district was responsible for the costs of the residential program. *Id*. at 694, 696.[8]

---

[8] Similarly, in *Independent School District No. 284 v. A.C.*, 258 F.3d 769 (8th Cir. 2001), the Eighth Circuit found that residential treatment was warranted because it was necessary to directly address the child's educational problems. There, the child suffered from emotional and behavioral disorders that manifested themselves in "classroom disruption, profanity, insubordination, and truancy." *Id*. at 771. Evaluations of the student suggested that these disorders were interfering with her academic progress and that she needed a highly structured program in order to benefit from educational instruction. *See id*. at 772. Because the child's emotional and behavioral disorders "need[ed] to be addressed in order for [her] to learn," and because evaluations suggested that a residential program would be the only effective way of treating those problems, the Eighth Circuit concluded that residential placement was appropriate. *Id*. at 777; *see also Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997) (residential placement appropriate in light of student's "stalled academic performance" and the determination that the student's "debilitating emotional problems could only be properly addressed in a highly structured

School districts are not, however, financially responsible for the placement of students who need twenty-four-hour supervision for medical, social, or emotional reasons, and receive only an incidental educational benefit from that placement. *See Mary T.*, 575 F.3d at 245–46; *Kruelle*, 642 F.2d at 693 ("Analysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process."). In determining whether schools should be held financially responsible for the costs of residential placement, courts must consider whether the service is necessary to ensure that the child receives some educational benefit, and they must assess the strength of the link between that service and the child's educational needs. *Mary T.*, 575 F.3d at 244 (citing *Kruelle*, 642 F.2d at 694).

Applying this analysis in *Mary T.*, we determined that there was an insufficient link between the child's placement in a long-term psychiatric facility and her educational needs. There, the child suffered from psychotic events, severe anger problems, substance abuse, and self-harming behavior. 575 F.3d at 239. She had previously been placed in a residential educational facility and a psychiatric hospital, but neither of those facilities was able to provide appropriate care. *Id.* Although the long-term psychiatric facility at which she was subsequently placed was an accredited rehabilitation facility, it did not have any

residential setting"); *Taylor v. Honig*, 910 F.2d 627, 632–33 (9th Cir. 1990) (student placed in special educational school to treat severe emotional disturbance that was interfering with his ability to learn).

educational accreditation, nor did it have an on-site school, special education teachers, or school affiliation; the child spent most of her time there in intensive individual and group therapy. *Id*. Although we recognized that the child may have received some educational benefit from her therapy sessions, those sessions were "predominately designed to make her aware of her medical condition and how to respond to it"; they were "neither intended nor designed to be responsive to the child's distinct 'learning needs.'" *Id*. at 245. Therefore, the parents were not eligible for reimbursement.

Other courts of appeals have reached similar results when the services were directed primarily at the child's medical or emotional needs, rather than the child's educational needs. In *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir. 1990), for example, a student suffering from serious emotional problems was also placed in an acute care psychiatric hospital providing few educational services, and her parents sought reimbursement for that placement. *Id*. at 639. In assessing the link between the child's educational needs and the placement, the Ninth Circuit concluded that the services provided by the hospital were not primarily provided to allow the student to benefit from her education, but instead were excludable medical expenses. *Id*. at 645; *see also Butler*, 225 F.3d at 894–95 (finding that parents were not entitled to reimbursement for hospitalization because "education was not the purpose of her hospitalization," and explaining that "[u]nlike in-school nursing in *Cedar Rapids*, Niki's inpatient medical care was necessary in itself and was not a special accommodation made necessary only to allow her to attend school or receive education").

Unlike the students in *Mary T.* and *Clovis*, O.M. was

placed at a facility that did offer an educational component. Wediko's residential treatment program included a full school day, with a curriculum that met New Hampshire's educational standards. O.M. began attending those classes about two to three weeks after his admission. In addition to academic classes, the school day included three debriefing periods for assessing how well O.M. was maintaining control of thoughts, mood, and anxiety. The District Court recognized that O.M. "undoubtedly benefitted" from this educational program.

The relevant question, however, is whether O.M. had to attend a residential facility because of his educational needs—because, for example, he would have been incapable of learning in a less structured environment—or rather, if he required residential placement to treat medical or mental health needs segregable from his educational needs. *Mary T.*, 575 F.3d at 243–44 (private placement must be "necessary for *educational* purposes," as opposed to "a response to medical, social or emotional problems that are segregable from the learning process" (quoting *Kruelle*, 642 F.2d at 693) (emphasis added)); *cf.* 34 C.F.R. § 300.104 (schools must bear the costs of placement in a residential program when such placement "is necessary to provide special education and related services to a child with a disability"). The fact that a particular residential facility does not even offer educational programs may be strong evidence that the child was placed there to meet his medical or emotional needs. *See Mary T.*, 575 F.3d at 245–46 (explaining that the facility's lack of educational accreditation and on-site educators "further demonstrated" that the child's placement was not educational). Conversely, the fact that classes are offered may provide evidence that the purpose of the placement is, in fact, educational. But O.M.'s participation in some educational programs at Wediko does not conclusively establish that the

18

purpose of his placement there was educational. Other factors—such as evaluations of the student's actual educational needs,[9] or evidence of a psychiatric crisis prompting the placement[10]—should also be considered.

Here, O.M. was enrolled at Wediko to meet his mental health needs, and any educational benefit he received from the Wediko placement was incidental. The placement at Wediko was prompted by a medical emergency. His parents "feared for his personal safety," and they enrolled him at Wediko "in order to prevent him from harming himself." *Munir v. Pottsville Area Sch. Dist.*, 2012 WL 2194543, at *15 (M.D. Pa. June 14, 2012). Thus, although O.M. did attend specialized classes while at Wediko, services there were more medical than educational. *Id.* Indeed, O.M. was an above-average student at Pottsville, who

---

[9] *See, e.g.*, *Clovis*, 903 F.2d at 645 (remarking that the student's program at the hospital "was implemented not by the [IEP] designed by the school system, but was instead determined by a medical team, supervised by a licensed physician").

[10] *See, e.g.*, *Butler*, 225 F.3d at 893 (noting, in finding that the school district was not financially responsible for the student's placement, that the student's "hospitalization was prompted by a psychiatric crisis"); *Taylor*, 910 F.2d at 633 (explaining, in finding that placement at a special educational school was appropriate, that "[t]he placement was not ordered in response to any medical crisis; on the contrary, the IEP developed on May 9, 1988 stated that Todd was 'medically stable' and that a state hospital was inappropriate for him"); *Clovis*, 903 F.2d at 645 (child's hospitalization was in response to a medical crisis).

had no serious problem with attendance and socialized well with other students. Because O.M.'s parents have not shown that they placed O.M. at Wediko in order to meet his specialized educational needs, the District Court correctly determined that they are not entitled to reimbursement.[11]

B

Munir also challenges the District Court's determination that he was not entitled to reimbursement for the cost of tuition at Phelps during the 2009-2010 school year, which amounted to $42,100. O.M. was placed at Phelps after his parents rejected the IEP proposed by the School District in May 2009. O.M.'s parents also rejected a second IEP in September 2009 because it did not provide certain services that they believed would be beneficial—in particular, smaller class sizes and the type of counseling services that had been available at Wediko.

As noted previously, parents are only entitled to tuition reimbursement when the school district has failed to offer a FAPE. School districts are required to offer an IEP that is "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *P.P.*, 585 F.3d at 729−30 (quoting *Shore Reg'l High Sch.*, 381 F.3d at 198). They are not, however, required to "maximize the potential" of each handicapped student. *T.R.*, 205 F.3d at 577 (quoting *Rowley*, 458 U.S. at 197 n.21).

---

[11] Because we find that the District Court did not err in holding that Wediko was not an "appropriate placement," we need not address Munir's claims relating to alleged procedural violations committed by the school district.

The District Court did not err in determining that the IEP offered by the School District in May and September 2009 satisfied the School District's obligations under the IDEA. In designing O.M.'s IEPs, the School District took into account Wediko's evaluation of O.M. and "incorporated virtually all of the Wediko recommendations." *Munir*, 2012 WL 2194543, at *9. The District Court recognized that smaller classes and more emotional support might "contribute to [O.M.'s] ability to learn more easily," *id*. at *16, but it determined that neither was necessary to ensure that O.M. received meaningful educational benefits. Munir has not shown that this conclusion was clearly erroneous.

Accordingly, we will affirm the judgment of the District Court.