

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-20-2004

# Shore Regional High v. P.S.

Precedential or Non-Precedential: Precedential

Docket No. 03-3438

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Shore Regional High v. P.S." (2004). *2004 Decisions.* Paper 360.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/360

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No. 03-3438
_____

SHORE REGIONAL HIGH SCHOOL
BOARD OF EDUCATION

v.

P. S., ON BEHALF OF P.S.,

Appellant

_____

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT
FOR THE DISTRICT OF NEW
JERSEY

District Court Judge: Honorable Mary L.
Cooper
(D.C.  No. 01-cv-5758)

_____

Argued: June 16, 2004

Before:  ALITO, SMITH, and DuBOIS,[*]
Circuit Judges

_____

*The Honorable Jan E. DuBois, District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

(Opinion Filed: August 20, 2004 )

MICHAELENE LOUGHLIN (argued)
Loughlin and Latimer
131 Main Street, Suite 235
Hackensack, NJ 07601

*Counsel for Appellant*

DAVID M. HAWKINS (argued)
NATALIE S. SHAHINIAN
CHRISTOPHER LAZAS
Purcell,  Ries,  Shannon,  Mulcahy  &
O'Neill
One Pluckemin Way
P.O. Box 754
Bedminster, NJ 07921

*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

ALITO, Circuit Judge:

This is an appeal from a District Court order overturning a state administrative law judge's decision holding that a school district failed to provide a "free appropriate public education" within the meaning of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487, for a student who had been subjected to severe and prolonged harassment by other students.  We hold that the District Court improperly failed to give "due weight" to the ALJ's determination, and we therefore reverse.

## I.

P.S. was born in 1986 and attended public schools in the Oceanport (New Jersey) School District from kindergarten through eighth grade. In elementary school, P.S. was teased by other children who viewed him as "girlish," but when P.S. began to attend the Maple Place Middle School in fifth grade, the bullying intensified. In the words of the District Court, P.S "was the victim of relentless physical and verbal harassment as well as social isolation by his classmates." App. 13.

Most of the harassment of P.S. focused on his lack of athleticism, his physique, and his perceived effeminacy. Bullies constantly called P.S. names such as "faggot," "gay," "homo," "transvestite," "transsexual," "slut," "queer," "loser," "big tits," and "fat ass." Bullies told new students not to socialize with P.S. Children threw rocks at P.S., and one student hit him with a padlock in gym class. When P.S. sat down at a cafeteria table, the other students moved. Despite repeated complaints, the school administration failed to remedy the situation.

The constant harassment began to cripple P.S. He became depressed, and his schoolwork suffered. When P.S. was in fifth grade, his mother, on the recommendation of the school psychologist, obtained private psychiatric counseling for him. The psychiatrist diagnosed P.S. with depression and prescribed medication, but there was no appreciable improvement. After P.S.'s grades slipped badly, Maple Place evaluated him and classified him as eligible for special education and related services based on perceptual impairment. The Oceanport Child Study Team ("CST") then developed an Individualized Education Program ("IEP") that placed P.S. in the "resource room" for math and gave him extra teacher attention to help with his organizational skills. The CST manager believed that P.S.'s poor academic work was due to the bullying rather than any cognitive deficiencies.

P.S.'s classification remained throughout sixth and seventh grade, and his IEP was expanded to include a daily resource-center literature class and an alternative physical education class to help him with his physical skills and to avoid the locker room changing period, during which other children ridiculed his physique. The school also permitted P.S. to change classes at special times so that he would not encounter other students in the hallways and could thus avoid the harassment that customarily occurred there. In eighth grade, the harassment became so intense that P.S. attempted suicide. At the request of his psychiatrist, who told the CST manager that P.S.'s life and health were at stake, P.S. received home schooling for six weeks. In February and March of that year, Maple Place changed P.S.'s classification, finding him eligible for special education on the basis of emotional disturbance.

The public high school serving P.S.'s community is Shore Regional High

School ("Shore"), but P.S.'s parents had begun to look for a different school for their son some years earlier, and they eventually became interested in Red Bank High School ("Red Bank"), the public high school in a neighboring school district. Red Bank was attractive both because it did not enroll students from Maple Place and because it had a drama program that appealed to P.S.'s interests. P.S. auditioned for the Red Bank drama program and was accepted. P.S.'s parents then asked Shore to place him at Red Bank, and the Oceanport CST concurred. The CST believed that if P.S. attended Shore Regional High School he would experience the same harassment that had occurred at Maple Place because the bullies who were responsible would also be there.

Shore undertook its own evaluation, relying mostly on the Maple Place IEP and a surveillance of P.S. in his classes. Despite the recommendation from the CST, Shore rejected P.S.'s request to attend Red Bank and concluded that he should attend Shore for ninth grade. Shore apparently believed that if it granted P.S.'s request, it would have to grant the request of non-disabled students who wished to attend Red Bank. Shore's affirmative action officer, Dr. Barbara Chas, contended that Shore could contain the bullying by disciplining bullies and by utilizing peer and social worker mediation. Shore also proposed an IEP in which P.S. would attend the resource room for math and would have a supplemental course in learning skills, adaptive gym classes, and weekly counseling. Based on this program, the Shore authorities concluded that their school would be the "least restrictive environment" for P.S. See 20 U.S.C. § 1412(a)(5) (school must provide education in least restrictive environment).

P.S.'s parents strongly disagreed with Shore's decision and unilaterally placed him in Red Bank for the ninth grade. Initially, Red Bank did not create an IEP for P.S., but did provide him with a special education class in algebra and academic support. While Red Bank did not schedule weekly counseling sessions, it made clear to P.S. that counseling was available upon request. Red Bank's plan was to mainstream P.S. for all his classes. When P.S. was in ninth grade, Red Bank created an IEP for him that maintained his academic support center class, but mainstreamed him for all other classes. Like Shore, Red Bank offered a program to combat bullying that included discipline and diversity seminars. As the District Court noted, P.S. "thrived both academically and socially at Red Bank." App. 23.

After Shore rejected P.S.'s request to attend Red Bank, P.S.'s father filed a mediation request with the New Jersey Department of Education. Mediation proved unsuccessful, and the action was transferred to the New Jersey Office of Administrative Law for a "due process hearing." Before the hearing, both sides agreed to an independent evaluation by the Institute for Child Development at the Hackensack University Medical Center

("Hackensack"). Hackensack recommended that P.S. attend a school such as Red Bank.

At the due process hearing, the ALJ heard testimony from several witnesses, including P.S., his mother, Dr. Chas, Dr. Mina Corbin-Fliger (a member of the Oceanport CST), and Dr. Carol Friedman (a psychologist at Hackensack). All of the witnesses agreed that P.S. had been subjected to unusual levels of harassment. While Dr. Chas testified that she believed that Shore could control the bullying, P.S., his mother, Dr. Corbin-Fliger, and Dr. Friedman all disagreed. The ALJ also reviewed several documents relating to P.S.'s case, including his IEPs and recommendations regarding placement.

The ALJ concluded that Shore could not provide P.S. with a "free appropriate public education," as required by the IDEA, see 20 U.S.C. § 1412(a)(1), because of the "legitimate and real fear that the same harassers who had followed P.S. through elementary and middle school would continue [to bully him.]" App. 41. The ALJ was particularly concerned that the bullies from P.S.'s area would harass him during largely unsupervised school bus rides to Shore and that Shore would be unable to provide for P.S.'s emotional needs within its very large student body. App. 42, 47. The ALJ ordered Shore to reimburse P.S. for the out-of-district tuition and related costs, including P.S.'s reasonable attorneys' fees.

Shore then commenced this action in the District Court, naming P.S.'s father as the defendant, and P.S.'s father filed a counterclaim for attorneys' fees. Relying on the administrative record, the District Court reversed the ALJ's decision. Crediting Dr. Chas's testimony, the District Court found that Shore offered P.S. a free appropriate public education. The Court wrote:

> The inability of the *Maple Place administration* to successfully discipline its students does not make *Shore* an inappropriate placement. No school can ever guarantee that a student will not be harassed by other students. . . . However, we find that, in light of the structured disciplinary mechanism in place at Shore and Chas's opinion regarding the supportive nature of students involved in drama there, the risk that the harassment would continue was not so great as to render Shore inappropriate.

App. 31-32 (emphasis in original).

The District Court did not accept the testimony of Dr. Corbin-Fliger and Dr. Friedman, stating that they had "focused on the failure of the Maple Place administration to discipline [the] tormenters; they did not address whether the Shore administration would have been able to address the problem." App. 23. The Court also implicitly faulted Dr.

4

Friedman on the ground that she had "never visited Shore to investigate their disciplinary measures or the type of environment supplied by its drama program." Id. at 30 n. 21. In addition, the District Court concluded that "Shore was the least restrictive environment for P.S. because it was his local public high school, where he would have been educated with other nondisabled children." Id. at 33.

## II.

All states receiving federal education funding under the IDEA must comply with federal requirements designed to provide a "free appropriate public education" ("FAPE") for all disabled children. See 20 U.S.C. §1412(1). "The term 'free appropriate public education' means special education and related services that--

> (A) have been provided at public expense, under public supervision and direction, and without charge;

> (B) meet the standards of the State educational agency;

> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."

20 U.S.C. §1401(8).

States provide a FAPE through an individualized education program ("IEP"). See 20 U.S.C. 1414(d). The IEP must be "reasonably calculated" to enable the child to receive "meaningful educational benefits" in light of the student's "intellectual potential." Polk v. Cent Susquehanna Interm. Unit 16, 853 F.2d 171, 181 (3d Cir. 1988).

Under 20 U.S.C. § 1412(5), children must also be educated in the least restrictive environment. This means that, "[t]o the maximum extent appropriate, children with disabilities . . . are [to be] educated with children who are not disabled" and that children with disabilities are not to be placed in special classes or otherwise removed from "the regular educational environment" except when "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Id.

As long as a state satisfies the requirements of the IDEA, the state may fashion its own procedures. Under New Jersey law, a CST composed of a psychologist, a learning disability teacher-consultant, and a school social worker conducts an evaluation of the student. See N.J.S.A. §18A:46-5.1. Using the CST's evaluation, the school district determines whether the student should be classified as disabled. See N.J.A.C. §6A:14-3.1. If the student is found to be disabled, the school assembles a team to create an IEP for the

child. See N.J.A.C. §6A:14-3.7. This program is reevaluated every year, and the child's eligibility is redetermined every three years. See N.J.A.C. §6A:14-3.8.

Under 20 U.S.C. § 1415, dissatisfied parents may challenge a school district's determinations in an administrative proceeding. In New Jersey, the parents and the school board first undergo mediation, and if mediation is unsuccessful, a "due process hearing" is held before a state administrative law judge. See 20 U.S.C. § 1415(e) and (f); N.J.A.C. § 6A:14-2.7(c) and (d). Parents who disagree with their child's placement may unilaterally enroll their child in a different school and seek reimbursement. N.J.A.C. § 6A:14-2.10)d). However, no reimbursement is required if the school district offered the student a FAPE. N.J.A.C. § 6A14-2.1(a).

Any party aggrieved by a placement decision may bring suit in a state court of competent jurisdiction or a federal district court. 20 U.S.C. § 1415(i)(2). In a case in which parents seek reimbursement for a unilateral placement, the District Court must first determine whether the IEP afforded the student a FAPE. School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 370 (1985). The school has the burden of showing that a FAPE was offered. See Oberti v. Board of Educ. of Borough of Clementon School Dist., 995 F.2d 1204, 1219 (3d Cir. 1993). To meet this burden, the school must establish that it complied with the procedures set out in the IDEA and that the IEP was

"reasonably calculated" to enable the child to receive "meaningful educational benefits" in light of the child's "intellectual potential." See Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 206-07 (1982); Ridgewood Bd.of Educ.v. N.E., 172 F.3d 238, 247 (3d Cir. 1999). If the IEP did not provide a FAPE, the District Court must then decide whether the parents took appropriate actions. See Michael C. v. Radnor Twp. Sch. Dist., 202 F.3d 642, 651 (3d Cir. 2000).

The burden of proof that a District Court must apply when an IDEA decision by a state agency is challenged is unusual. Although the District Court must make its own findings by a preponderance of the evidence, 20 U.S.C. § 1415 (1)(2)(B)(iii), the District Court must also afford "due weight" to the ALJ's determination. Rowley, 458 U.S. at 206; see also Holmes v. Millcreek Tp. School Dist., 205 F.3d 583, 591 (3d Cir. 2000). Under this standard, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and "[i]f a reviewing court fails to adhere to them, it is obliged to explain why." S.H. v. State-Operated School Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003). In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. Id.; Carlisle Area School v. Scott P., 62 F.3d

520, 527-29 (3d Cir. 1995). Specifically, this means that a District Court must accept the state agency's credibility determinations "unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion." Carlisle, 62 F.3d at 529 (emphasis added). In this context the word "justify" demands essentially the same standard of review given to a trial court's findings of fact by a federal appellate court. See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 574 (1985).

When a District Court decision in a case such as this is appealed to us, we of course exercise plenary review with respect to the question whether the District Court applied the correct legal standards under the IDEA, see Polk, 853 F.2d at 181, but we review the District Court's factual findings for clear error. T.R. v. Kingwood Tp. Bd. of Educ., 205 F.3d 572, 576 (3d Cir. 2000)(citations omitted). "A finding of fact is clearly erroneous when, after reviewing the evidence, the court of appeals is left with a definite and firm conviction that a mistake has been committed." Oberti, 995 F.2d at 1204 (internal quotation marks omitted).

## III.

The District Court in this case did not properly apply the "due weight" standard. Both the ALJ and the District Court were confronted with conflicting opinions by experts on the question whether placement at Shore offered P.S. an education that was sufficiently free from the threat of harassment to constitute a FAPE. The ALJ who heard the witnesses during a hearing that extended over four days credited the witnesses who opined that placement at Shore would have exposed P.S. to a continuation of the devastating bullying that had occurred in Middle School. The District Court did not point to any "nontestimonial evidence" that undermined the testimony of these witnesses. See S.H., 336 F.3d at 271. Instead, the Court simply chose to credit a witness who expressed a contrary opinion. In taking this approach, the District Court did not give the requisite deference to the ALJ's evaluation of the witnesses' credibility.

As noted, Dr. Friedman, a psychologist at the Institute for Child Development at the Hackensack University Medical Center, and Dr. Corbin-Fliger, a member of the Oceanport CST, testified unequivocally that placement at Shore would not have been appropriate due to the threat of harassment. Dr. Corbin-Fliger was fully informed about Shore's program, but she testified "a high school situation is even more unrestrictive than a middle school situation" and that "no matter what program" Shore implemented, she did not believe that P.S. would "be in a safe environment with the same kids" who had previously harassed him. App. 134-5.

Dr. Friedman testified that bullying does not go away on its own, particularly when the victim is 12 years of age or older. App. 198. Indeed, she stated that one could "pretty much guarantee" that the bullies would continue to harass P.S. if

7

given the chance. Id. at 215. She stated that, while "intensive interventions" with the bullies, the onlookers, and the victim "can be helpful" under some circumstances, this strategy "is most effective at the beginning" of a course of harassment, and she noted that the harassment of P.S. had been going on for years. Id. at 202. As a result, she testified, the "bullies are . . . used to looking at [P.S.] in this manner, and . . . he's used to dealing with them in this manner." Id. at 205. She expressed particular concern about the "ripe opportunity" that the bullies from P.S.'s area would have to harass him on school bus rides to and from Shore, id. at 203, and she opined that neither the presence at Shore of students who had not attended Maple Shade nor participation by P.S. in Shore's drama program would have been enough to protect him. Id. at 210, 219. Finally, she observed that simply seeing the bullies at Shore would have adversely affected P.S's self-esteem and his "ability to concentrate and focus." Id. at 205.

Rejecting the ALJ's decision to credit these witnesses, the District Court was more impressed by the testimony of Dr. Chas, the Shore affirmative action officer, who opined that Shore would be able to control the bullying problem because it provides "peer mediation" and "counseling and training for both victims and perpetrators of harassment" and employs "a structured disciplinary system" with "a hierarchy of punishments." App. 30-31. Dr. Chas also maintained that the influence of the students from Maple

Shade would be diluted by students who had attended other middle schools and that P.S. would receive support from the students in the Shore drama club, who were "a tight-knit group that is accepting of newcomers." Id. at 31.

As previously noted, the District Court was required under our cases to provide an explanation for its decision to reject the ALJ's decision to credit Dr. Friedman and Dr. Corbin-Fliger, but the District Court's chief explanation does not accurately characterize these witnesses' testimony. The District Court faulted Dr. Corbin-Fliger and Dr. Friedman because, in the Court's view, they "focused on the failure of the Maple Place administration to discipline these tormenters" and "did not address whether the Shore administration would have been able to address the problems." App. 30. In fact, however, while Drs. Corbin-Fliger and Friedman certainly took into account P.S.'s experiences at Maple Shade (as did Dr. Chas), they focused upon and squarely addressed the question whether Shore would have been able to protect P.S. from devastating harassment. Fairly read, their collective testimony was that Shore would not have been able to remedy the problem because, among other things, the same bullies would be present at Shore; bullies generally do not stop on their own; even "intensive interventions" are often not effective when they are not begun until after a course of harassment has continued for some time; the presence at Shore of students who had not attended Maple Shade would not have shielded P.S.; the

bullies would have had a ripe opportunity to harass P.S. on the bus; and, in short, no matter what program Shore implemented, P.S. would not have been adequately protected. Thus, the witnesses upon whom the ALJ relied directly addressed the question whether Shore would have been able to deal with the harassment problem successfully.

In a footnote, the District Court also implicitly criticized Dr. Friedman's testimony on the ground that she "never visited Shore to investigate their disciplinary measures or the type of environment supplied by its drama program." App. 30 n. 21. On cross-examination, Dr. Friedman was asked why she had not visited Shore, and she responded that the Institute for Child Development had based its evaluation on the information that Shore had released and that Shore had not suggested that a visit to the school was needed. See App. 206. Since the District Court did not identify any specific and material information that only an actual visit to Shore would have revealed, the Court's criticism of Dr. Friedman for not making such a visit is largely beside the point. In short, the District Court provided no substantial reason for refusing to credit the witnesses upon whom the ALJ clearly relied.

Moreover, the District Court failed to acknowledge weaknesses in Dr. Chas's testimony. Dr. Chas provided little support for her belief that the Shore program could remedy the problem that P.S. had faced. She did not claim that

Shore could prevent the Maple Shade bullies from having any contact with P.S. Nor did she claim that Shore had ever dealt successfully with a harassment problem of this severity in the past. Nor did she claim that she knew of cases in which other high schools had successfully cured problems of this nature by means of a program similar to the one that Shore proposed. In addition, although it appears that Dr. Chas's opinion rested heavily on the view that Shore's disciplinary system would deter the bullies, she did not explain in concrete terms how that system could have dealt satisfactorily with a campaign of harassment involving a barrage of abusive conduct of a sort that is difficult to prove in a disciplinary proceeding – for example, constant snickering, shunning, or mumbled epithets that no one other than P.S. claims to have heard.

We do not suggest that Dr. Chas's opinion was unworthy of belief or that the testimony of Dr. Corbin-Fliger and Dr. Friedman was beyond dispute. But the task of evaluating their conflicting opinions lay in the first instance with the ALJ in whose presence they testified. When the ALJ's determination in this case is given its "due weight," we see no basis for overturning that determination. In doing so, the District Court did not heed the "due weight" standard, and the District Court's finding that Shore offered FAPE was clearly erroneous.

**IV.**

For the reasons set out above, we reverse the order of the District Court and

9

remand for the entry of summary judgment in favor of the defendant on the issue of liability and for a determination of the amount of reimbursement, attorney's fees, and any other costs that the school district owes.