MARY Courtney T.; Bruce T.; Letty T., All of Philadelphia, Pennsylvania

. v.

SCHOOL DISTRICT OF PHILADELPHIA, Appellant.

Mary Courtney T.; Bruce T.; Letty T., All of Philadelphia, Pennsylvania, Appellants

v.

School District of Philadelphia.

Nos. 08–2676, 08–2870.

United States Court of Appeals, Third Circuit.

Argued April 14, 2009.

Filed: July 31, 2009.

Joseph Anclien, Jennifer Pao, Carl A. Solano, (Argued), Schnader Harrison Se-gal & Lewis, Philadelphia, PA, Elizabeth S. Mattioni, City of Philadelphia Law Department, Philadelphia, PA, Miles H. Shore, School District of Philadelphia, Office of General Counsel, Philadelphia, PA, Counsel for Appellant.

Dennis C. McAndrews, David T. Painter, Gabrielle C. Sereni, (Argued), McAndrews Law Offices, Berwyn, PA, Counsel for Appellee.

Before: McKEE, SMITH, Circuit Judges and STEARNS, District Judge.*

OPINION

SMITH, Circuit Judge.

In this case concerning the Individuals with Disabilities in Education Act, appellant School District of Philadelphia ("School District") appeals a District Court order requiring it to reimburse Mary Courtney T. ("Courtney") and her parents (collectively, "Plaintiffs") for the cost of Courtney's placement in a residential health care facility from October 12, 2005 to January 26, 2006. Plaintiffs cross-appeal the District Court's denial of reimbursement for placement at the same facility from May 23, 2005 to October 12, 2005, and they seek compensatory education in the event that we deny their request for reimbursement. For the reasons that follow, we will affirm in part and reverse in part.

I.

A.

Courtney and her parents live in the School District. Courtney, who is now 22

* The Honorable Richard G. Stearns, District Judge for the United States District Court of Massachusetts, sitting by designation.

years old, suffers from learning disabilities, speech and language impairments, attention deficit hyperactivity disorder, and other mental health disorders. Because of her educational needs, the School District paid for Courtney to attend private schools beginning in 1993 when Courtney entered kindergarten.

Since 2001, Courtney's evolving needs have required a variety of educational and medical placements. In the fall of 2001, she was briefly hospitalized as a result of escalating behavioral problems including self-injury. Then, after she was diagnosed during a 2002 evaluation with a variety of educational and emotional special needs, Courtney's parents unilaterally placed her at the Rancho Valmora School ("Rancho Valmora"), a residential educational institution in New Mexico that specializes in the treatment of adolescents with educational, emotional, and behavioral problems. Courtney did well at the school, and she was discharged and returned to Philadelphia in June 2003. She was then placed at the Pathway School ("APS") for the 2003–2004 academic year. Courtney appeared to flourish, becoming valedictorian of her class at the end of the year. But by the beginning of the following school year, her emotional condition began to deteriorate and APS could no longer serve her needs. In December 2004, Courtney's parents placed her back at Rancho Valmora.

Courtney's condition continued to worsen in 2005. Rancho Valmora's educational plan from February of that year notes psychotic events, severe anger problems, the abuse of chemical substances, and self-harming behaviors. At the end of April, Rancho Valmora informed Courtney's parents that it could no longer provide sufficient care for Courtney because of her self-abusive and aggressive behaviors. Courtney's parents then placed her for a short period at the Menninger Clinic, a psychiatric hospital in Houston, Texas. The Clinic discharged Courtney on May 22, 2005 because it was unable to serve her needs. The following day, Courtney's parents enrolled her in Supervised LifeStyles ("SLS").

SLS is a long-term psychiatric residential treatment center in New York. It is licensed by the New York State Office of Mental Health and is accredited with a national organization for the accreditation of rehabilitation facilities. It does not have any educational accreditation. It also has no on-site school, special education teachers, or school affiliation.

For more than six months at SLS, Courtney was treated in the acute care wing. She received twenty-four hour care provided on a one-to-one, staff to patient ratio. Courtney did not receive educational services during this period; most of her days were spent in intensive individual and group psychotherapy. The School District sought to conduct a neuropsychological evaluation in June 2005, but was unable to do so because Courtney's parents advised that she was not sufficiently stable at the time. Also, according to the School District, Courtney's parents stated that her educational plan from Rancho Valmora could not be implemented at SLS because of Courtney's emotional state. In fact, nearly every person to have evaluated Courtney appears to agree that her safety and emotional well-being were the predominate concerns for at least the first five months she was at SLS.

On October 12, 2005, Courtney's parents informed the School District that she could be evaluated. An evaluation, which the School District arranged to be conducted on October 17, 2005, noted Courtney's limited academic capacity at the time and recommended focusing her instruction on adaptive and vocational skills. Thereafter,

on November 16, 2005, the School District assembled Courtney's educational team and developed an educational plan based on the evaluation. The plan provided for three hours per week of one-to-one tutoring in language arts, reading, and math; this instruction had a vocational and remedial focus as demonstrated, for instance, by Courtney's English instruction, which focused on vocabulary development and required her to give an oral presentation to improve her communication skills.

On December 6, 2005, Courtney was transferred from the acute care ward at SLS to the post-acute ward. Courtney received treatment at SLS from May 23, 2006 until her discharge on July 29, 2006.

**B.**

The Individuals with Disabilities Education Act ("IDEA") requires that a state receiving federal education funding provide a "free appropriate public education" ("FAPE") to disabled children. 20 U.S.C. § 1412(a)(1). School districts provide a FAPE by designing and administering a program of individualized instruction that is set forth in an Individualized Education Plan ("IEP"). 20 U.S.C. § 1414(d). The IEP "must be 'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Shore Reg'l High Sch. Bd. of Ed. v. P.S.*, 381 F.3d 194, 198 (3d Cir.2004) (quoting *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182–85 (3d Cir.1988)).

A parent who believes that a school has failed to provide a FAPE may request a hearing, commonly known as a due process hearing, to seek relief from the school district for its failure to provide a FAPE. 34 C.F.R. § 300.507. In Pennsylvania, the hearing is conducted by a Hearing Officer. *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 527 (3d Cir.1995). If challenged, the Hearing Officer's decision is then subject to an independent review of that decision by an appellate body, which is referred to as the Appeals Panel.[1] *Id.* Upon the completion of the Pennsylvania administrative process, a party may appeal the Appeals Panel decision to federal district court. 20 U.S.C. § 1415(e); *Carlisle Area Sch.*, 62 F.3d at 527.

In November 2005, Plaintiffs requested a due process hearing pursuant to 34 C.F.R. § 300.507 and sought to compel the School District to (1) reimburse Plaintiffs for the cost of Courtney's stay at Rancho Valmora, from December 2004 to April 2005, and SLS from May 2005 up to the date of the hearing; (2) provide compensatory education for the period May 23, 2005 up to the date of the hearing, in the event that tuition reimbursement was denied; and (3) pay for an independent evaluation of Courtney. A hearing was conducted in January 2006. The School District agreed to reimburse Plaintiffs for Courtney's stay at Rancho Valmora, but opposed reimbursement for the SLS placement on the ground that a medical crisis precipitated Courtney's stay there.

The Hearing Officer faulted the School District for failing to develop an IEP in June 2005 and for not providing educational services beginning in May 2005 when Courtney entered SLS. He rejected arguments that Courtney's expenses at SLS were medical as opposed to educational, concluding that her educational needs were

---

**1.** The Pennsylvania Department of Education funds an independent entity to administer and oversee disputes related to special education services, the Office for Dispute Resolution. This entity is responsible for choosing Hearing Officers and Appeals Panel members. For more information, see Office for Dispute Resolution, http://odr.pattan.net/default.aspx (last visited July 21, 2009).

not severable from her medical needs. The Hearing Officer also determined that SLS was an appropriate placement. Accordingly, he awarded tuition reimbursement for Courtney's stay at SLS from May 2005 through January 2006.

The Appeals Panel reversed the decision of the Hearing Officer. The Panel noted the acute nature of Courtney's condition when she was admitted to SLS and concluded that Courtney's "admission to the New York facility was prompted by a psychiatric crisis, was necessary for medical reasons rather than educational purposes, and that the services provided to [Courtney] during the first four months there were medical rather than educational in nature." In such circumstances, it deemed it inappropriate to award tuition reimbursement for Courtney's stay at SLS.

Courtney appealed this decision to the United States District Court for the Eastern District of Pennsylvania. In its analysis, the District Court separated Courtney's treatment into two distinct time periods—the first period covered Courtney's stay in SLS's acute care ward from May 23, 2005 to October 12, 2005, and the second period covered from October 12, 2005, when Courtney's parents informed the School District that she could be evaluated, until January 26, 2006, the date through which the Hearing Officer awarded tuition reimbursement.

For the first period, the District Court concluded that Courtney was not entitled to tuition reimbursement because SLS "did not constitute 'special education' within the meaning of the IDEA." It noted that Courtney's "SLS placement did not contain any appreciable academic component." Further, to the degree that Courtney's program included some behavioral and emotional strategies that could aid her education, the Court concluded that this treatment was aimed at stabilizing her medical condition and not at enabling academic instruction.

With regard to the second period, the District Court awarded tuition reimbursement. It stated that, once the School District began providing educational services to Courtney, it also had an obligation to provide related services. In that regard, the Court determined that Courtney's treatment at SLS was a related service. It also concluded that the costs of SLS were not excluded by the "medical services" exception to federal regulations requiring the provision of related services.

Finally, the District Court denied the Plaintiffs' request for compensatory education for May 2005 through October 2005 in lieu of tuition reimbursement. The Court held that the School District developed Courtney's IEP within a reasonable period of time. It reasoned that Courtney's parents did not consent to an evaluation until October 12, 2005, the School District conducted that evaluation five days later, and it then developed the IEP within one month of the evaluation date.

## II.

■ We require a district court to apply a nontraditional standard of review when considering an appeal from a state administrative decision under IDEA. "Although the District Court must make its own findings by a preponderance of the evidence, the District Court must also afford 'due weight' to the ALJ's determination." *Shore Reg'l High Sch. Bd. of Ed.*, 381 F.3d at 199 (internal citation omitted). The "due weight" standard requires the court to consider the "[f]actual findings from the administrative proceedings ... prima facie correct" and, if the court fails to adopt those findings, it must explain its reasons for departing from them. *Id.* (internal quotation marks and citation omit-

ted). We, in turn, review the District Court's factual findings for clear error. *Id.*

■ We exercise plenary review over the legal standards applied by the District Court and over its legal conclusions. *Id.* ("When a District Court decision in a case such as this is appealed to us, we of course exercise plenary review with respect to the question whether the District Court applied the correct legal standards under the IDEA."); *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 266 (3d Cir. 2007) ("We exercise plenary review over the legal conclusions the district court reached in our review of an administrative adjudication in IDEA cases.").

### III.

■ Parents who believe that a public school is not providing a FAPE may unilaterally remove their disabled child from that school, place him or her in another school, and seek tuition reimbursement for the cost of the alternate placement. 20 U.S.C. § 1412(a)(10)(c); *Burlington Sch. Comm. v. Dep't of Educ.,* 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). A court may grant tuition reimbursement if the School District failed to provide the required FAPE and the parents sought an appropriate private placement. *DeFlaminis,* 480 F.3d at 276; *see also Forest Grove Sch. Dist. v. T.A.,* —— U.S. ——, 129 S.Ct. 2484, 174 L.Ed.2d 168 (2009) ("[W]hen a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school without the school district's consent, a court may require the district to reimburse the parents for the cost of the private education.").

We would ordinarily begin by determining whether Courtney was denied a FAPE. In this case, the FAPE analysis would require that we consider separately the two distinct periods of Courtney's stay at SLS—from May through October 2005, when Courtney was in SLS's acute care ward, and from October 2005 through January 2006, after Courtney's parents informed the School District that she could be evaluated and receive educational services—because the School District's provision of services differed during these periods. The second component of the tuition reimbursement analysis, however, does not require separate analyses for the different time periods, as it focuses on the appropriateness of SLS as a private placement. For this reason, we will start by considering whether SLS was an appropriate placement.

■ A parent's decision to unilaterally place a child in a private placement is proper if the placement "is appropriate, i.e., it provides significant learning and confers meaningful benefit...." *DeFlaminis,* 480 F.3d at 276 (internal quotation marks and citation omitted). That said, the "parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA." *Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238, 249 n. 8 (3d Cir.1999). In fact, the Supreme Court has ruled that a private school placement may be proper and confer meaningful benefit despite the private school's failure to provide an IEP or meet state educational standards. *Florence County Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 14–15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

In this case, the parties disagree as to whether Courtney's placement at SLS was appropriate. The School District argues that, particularly during her period in the acute-care ward, Courtney received exclusively medical services. The Appeals Panel agreed with this argument. It found that Courtney was in the acute care ward

because she needed one-to-one attention from "someone trained in crisis intervention. . . . Because of the acute nature of [Courtney's] mental illness during this four month period, the treatment goals and services for [Courtney] were almost entirely devoted to stabilizing her mental health; the treatment plan did not contain any academic goals."

Plaintiffs argue that, while Courtney was not capable of receiving traditional academic instruction, she could and did receive other services focused on behavior modification and her emotional wellness that can be considered educational in this context. Furthermore, they argue that her medical and educational needs were not severable under this Court's decision in *Kruelle v. New Castle County School District*, 642 F.2d 687, 694 (3d Cir.1981), thereby requiring the School District to reimburse Plaintiffs for Courtney's tuition at SLS.

### A.

In *Kruelle*, the plaintiff, Paul Kruelle, had severe mental disabilities and cerebral palsy—"at age thirteen he has the social skills of a six month old child and his I.Q. is below thirty. . . . [H]e cannot walk, dress himself, or eat unaided. . . . [H]e [also] has had a history of emotional problems which result in choking and self-induced vomiting when experiencing stress." 642 F.2d at 688–89 (internal quotation marks and citation omitted). In 1978, the Kruelles lived in Pennsylvania and Paul was enrolled in a residential educational facility that combined school programs with around-the-clock care. *Id.* at 689. Paul did well in this program, but he was forced to leave when his parents moved to Delaware. *Id.* In Delaware, Paul's parents sought and were denied a residential placement facility, and Paul was instead placed in a school during the day and a respite care facility in the evening. *Id.* The Kruelles then requested a due process hearing to challenge this placement. *Id.* After the state hearing officer and appeals body denied the Kruelles' request, the Kruelles sought review in this Court. *Id.* at 690.

The Kruelles' efforts to obtain a residential placement were rooted in Paul's emotional problems: the Kruelles' medical expert testified that Paul's stress-induced vomiting, choking, and self-destructive behaviors limited his ability to learn, but that a consistent environment could reduce these behaviors and improve Paul's ability to learn. *Id.* The defendant school argued that, because Paul's need for residential placement arose from his emotional problems, the school was not obligated to provide this placement or pay for it. *Id.* We disagreed.

We began by noting that, while "the scope and details of an appropriate education" are largely left to local school authorities, a school's obligations are guided by federal law requiring the provision of "special education" and "related services." *Id.* at 691. Furthermore, we recognized that federal regulations require residential "placements which are made by public agencies for educational purposes." *Id.* Finally, we acknowledged that "the concept of education is necessarily broad with respect to persons such as Paul. Where basic self-help and social skills such as toilet training are lacking, formal education begins at that point." *Id.* at 693.

With those principles as guideposts, we then considered "whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are seg-

regable from the learning process."[2] *Id.* If the placement was required by the former, the school was obligated to bear the cost; if the placement was necessitated by the latter, the cost of the placement was "the responsibility of the parents or social service agencies." *Id.* at 693–94. And to differentiate between the two possible predicates to a residential placement, the *Kruelle* Court instructed that we are to look to whether the "social, emotional, medical and educational problems . . . [are] so intertwined that realistically it is not possible for the court to perform the Solomon-like task of separating them." *Id.* at 694 (internal quotations and citation omitted). The *Kruelle* panel concluded: "The relevant question in the present case is whether residential placement is part and parcel of a specially designed instruction to meet the unique needs of a handicapped child." *Id.* (internal quotation marks omitted). Applying this framework to Paul's case, we held that Paul's emotional and medical needs were not severable: "[H]ere, consistency of programming and environment is critical to Paul's ability to learn, for the absence of a structured environment contributes to Paul's choking and vomiting which, in turn interferes fundamentally with his ability to learn." *Id.*

**B.**

██ Plaintiffs argue that SLS is not a medical facility or psychiatric hospital, but is instead a residential treatment facility. While SLS may be classified as a residential program, this fact alone is insufficient to warrant reimbursement. A wide variety of facilities—treating a range of issues from substance abuse to mental health and from aging services to spinal cord inju-

ries—can claim to be "residential programs." Only those residential facilities that provide special education, however, qualify for reimbursement under *Kruelle* and IDEA. In *Kruelle,* we stated that federal regulations require residential "placements which are made by public agencies for *educational purposes.*" 642 F.2d at 692 (emphasis added). In fact, federal regulations declare that "[i]f placement in a public or private residential program is *necessary to provide special education* and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.104 (emphasis added). Thus, we must consider whether the residential placement at SLS was necessary to provide Courtney with special education.

In *Kruelle,* we recognized that not all services that can be broadly construed as educational are cognizable under IDEA. This is because "ultimately any life support system or medical aid can be construed as related to a child's ability to learn." 642 F.2d at 694. Instead, we declared that we must "assess the link between the supportive service or educational placement and the child's learning needs." *Id.*

To support the argument that SLS provided special education as defined by *Kruelle,* Plaintiffs point to the fact that Courtney's program at SLS offered a "token economy program," through which students could earn "dollars" for good behavior to be spent for various rewards, and that it provided one-to-one support. They argue that these services are customarily offered in public schools. Plaintiffs also cite the fact that Courtney participated in

---

**2.** We explicitly stated that we were considering whether a residential placement was required to provide Paul with "special education," not whether it was a "related service." *Id.* at 694 ("[T]he present case asks whether residential placement is encompassed within the statutory heading of 'special education. . . .' ").

some SLS group therapies, such as the "Life Skills Training" and psychoeducational skills groups, that can arguably be considered educational given Courtney's limited academic abilities at that time and her need to learn how to manage her illness.

■ As an initial matter, we reject Plaintiffs' argument that because SLS utilizes some of the same modalities employed by schools it is thereby providing special education. This argument ignores the fact that institutions use tools such as a "token economy program" to incentivize a change in behavior, but the targeted behavior might well be one affecting health, education, or even conduct like the use of obscenities. Thus, the relevant consideration is not the tool the institution uses, but rather the substantive goal sought to be achieved through the use of that tool. For the reasons that follow, we believe that SLS employed these tools to enable Courtney to manage her medical condition, not her educational needs.

■ We acknowledge that some services Courtney received at SLS may have provided an educational benefit. They are not, however, the sort of educational services that are cognizable under *Kruelle.* During testimony before the Hearing Officer on January 9, 2006, Courtney's behavioral therapist at SLS testified that Courtney was enrolled in the "mood disorders group, the psychotic disorders group, medication and pychoeducational group, anxiety disorders group, psychological skills group, life skills training group, and medication group." When asked the purpose of these groups, the therapist responded: "Courtney will learn skills that will help with those specific areas. If Courtney is having depressive symptoms it will teach her coping skills to work with her depression and anxiety." For instance, the psychotic disorders group provided group

therapy where the members talked about how psychotic thoughts affect their daily lives and the psychological skills group taught techniques for anger control and managing other emotions. This account of the services provided to Courtney demonstrates that SLS's programs and skills were predominately designed to make her aware of her medical condition and how to respond to it. Thus, Courtney received services that are not unlike programs that teach diabetic children how to manage their blood sugar levels and diets—both sorts of programs teach children to manage their conditions so that they can improve their own health and well being. However, because both programs are an outgrowth of a student's medical needs and necessarily teach the student how to regulate his or her condition, they are neither intended nor designed to be responsive to the child's distinct "learning needs." *See Kruelle,* 642 F.2d at 694 (stating that IDEA requires "courts to assess the link between the supportive service or educational placement and the child's learning needs"). Accordingly, the link required by *Kruelle* between placement and the student's learning needs is lacking.

This is further demonstrated by the fact that the program at SLS is designed to address medical, rather than educational, conditions. SLS is licensed by the New York State Office of Mental Health, its sole accreditation is with a national organization of rehabilitation facilities, and it has no state educational accreditation or even any on-site educators. This stands in sharp contrast to *Kruelle,* where we noted that Paul's earlier residential placement had been in a facility jointly regulated by state education and social services organizations. 642 F.2d at 689. And Courtney's admission to SLS was necessitated, not by a need for special education, but by a need to address Courtney's acute medical condi-

tion. Statements from Courtney's parents and authorities at Rancho Valmora demonstrate that her condition deteriorated rapidly and that she needed emergency intervention and stabilization.

█ Finally, we conclude that Courtney's medical and educational needs are severable. In *Kruelle*, we began by noting that federal law requires schools to pay for non-medical care and room and board when a private residential placement provides special education. 642 F.2d at 692. Paul Kruelle's medical expert testified that Paul needed a consistent and structured environment in order to benefit from educational services: the expert testified that Paul might be able to physically tolerate a non-residential placement requiring a transition from home to school, but "he may not learn." *Kruelle v. Biggs,* 489 F.Supp. 169 (D.Del.1980) (recounting Paul's expert's testimony in greater detail); *see also Kruelle,* 642 F.2d at 690 (relaying the expert's testimony that Paul needed a consistent environment in order to learn). Thus, with only a change in environment and without more extensive medical interventions such as drugs or psychiatric care, Paul might be enabled to learn.

The present case is clearly distinguishable from *Kruelle*. Courtney's education was impeded, not by a lack of educational services or a specific kind of placement, but by a complex and acute medical condition. The School District could neither prevent the onset of such a condition nor control when it would subside. Furthermore, a change in environment would not by itself bring about an improvement in Courtney's medical condition—she required medical intervention, including psychiatric treatment and drug therapies, to address the biological pathology underlying her medical condition. This is far beyond the capacity and the responsibility of the School District.

## C.

█ Nor can SLS be reimbursable as a related service. Under IDEA, schools must provide not only special education, but also related services in order to furnish students with a FAPE. 20 U.S.C. §§ 1401(9), 1412(a). The term "related services" is defined to include:

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education....

20 U.S.C. § 1401(26)(A). The District Court concluded that, because the School District had begun to provide academic services to Courtney, it was obligated to provide related services. It further determined that the entire cost of Courtney's stay at SLS qualified as a related service because those costs did not run afoul of the limits on medical services.

While the District Court is correct that IDEA requires school districts to pay for some medical services, the costs of SLS are outside of the parameters of this mandate. IDEA states that medical services are covered "except that such medical services shall be for diagnostic and evaluation purposes only." *Id.* Federal regulations

further indicate that medical services only include those "services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." 34 C.F.R. § 300.34(c)(5).

Plaintiffs argue, however, that the Supreme Court has not interpreted medical services so narrowly. They point to a pair of Supreme Court cases—*Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999), and *Irving Independent School District v. Tatro*, 468 U.S. 883, 104 S.Ct. 3371, 82 L.Ed.2d 664 (1984)—requiring school districts to pay for nursing services in school settings. They argue that these cases make "abundantly clear that medical services are excluded from the responsibility of school districts under IDEA *only* when the service must be provided by a physician or hospital."

Though it is true that the Supreme Court has concluded that schools must provide school nursing services as related services, the present case does not fall under *Tatro* or *Cedar Rapids*. In *Tatro*, an eight-year-old girl needed clean intermittent catheterization ("CIC") to empty her bladder every three or four hours to remain in school. 468 U.S. at 885, 104 S.Ct. 3371. To determine whether CIC qualified as a related service, the Supreme Court stated that it must consider: (1) "whether CIC is a supportive service" that enables a child to benefit from special education; and (2) whether CIC is excluded as a medical service. *Id.* at 890, 104 S.Ct. 3371. It held that CIC was a supportive service, as "[a] service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education that Congress envisioned." *Id.* at 890–91, 104 S.Ct. 3371.

The Court also concluded that CIC was not excluded as a medical service because federal law and regulations pertaining to related services excluded physician services but specifically permitted those medical services that could be provided by a school nurse. *Id.* at 891–92, 104 S.Ct. 3371. It stated that this distinction likely arose from an effort "to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Id.* at 892, 104 S.Ct. 3371. Though the Court also said that it presumed that "medical services not owed under the statute are those services by a licensed physician that serve other purposes" than to determine a child's eligibility for special education, *id.* at 892 n. 10, 104 S.Ct. 3371, it did not expressly hold that physician services, and only physician services, are excluded medical services. In fact, it declared with regard to the federal regulations that, "[b]y limiting the 'medical services' exclusion to the services of a physician or *hospital,* both far more expensive, the Secretary has given a permissible construction to the provision." *Id.* at 893, 104 S.Ct. 3371 (emphasis added). The Court's statement that hospital services are specifically excluded would apply regardless of whether those services were provided by a physician, nurse, aide, or therapist in the hospital setting.

In *Cedar Rapids*, the Supreme Court was asked once again to consider whether a school was required to provide a disabled student "with certain nursing services during school hours." 526 U.S. at 68, 119 S.Ct. 992. Garret was a bright and creative student who was paralyzed in a motorcycle accident. *Id.* at 69, 119 S.Ct. 992. Though Garret needed many of the same types of services that were considered in *Tatro,* he needed them on a more continuous basis. *Id.* at 75–76, 119 S.Ct. 992.

The *Cedar Rapids* Court reaffirmed that, with regard to supportive services, Congress envisioned "services that enable a disabled child to remain in school during the day." *Id.* at 73, 119 S.Ct. 992. It also reaffirmed that the "likely cost of the services and the competence of school staff" justified drawing a line between excluded and covered medical services. *Id.* at 74, 119 S.Ct. 992. That said, the Court stated that the continuous nature of services, and the higher costs associated with that level of support, did not render those services "more 'medical.'" *Id.* at 76, 119 S.Ct. 992. The Court reasoned: "Defining 'related services' in a manner that *accommodates* the cost concerns Congress may have had is altogether different from using cost *itself* as the definition." *Id.* at 77, 119 S.Ct. 992.

The instant case is distinguishable from *Tatro* and *Cedar Rapids*. In the first instance, we note that it is not clear that SLS even qualifies as a "supportive service" under *Tatro* and *Cedar Rapids*. While stabilizing Courtney's medical condition would ultimately render her more amenable to educational services, the services provided by SLS did not enable her "to remain at school during the day." As Courtney's behavioral therapist indicated, even with several weeks of extensive support and services at SLS, Courtney was not sufficiently stable to undergo evaluation or receive educational services.

Beyond this, however, we believe Courtney's care at SLS is an excluded medical service. As noted above, while the Supreme Court stated that physician services other than those provided for diagnostic purposes are excluded, it also specifically excluded hospital services. *See Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings,* 903 F.2d 635, 643–644 (9th Cir. 1990) (concluding that medically excluded services are not only those services provid-

ed by a physician, but also those services provided in a psychiatric hospital); *see also Butler v. Evans,* 225 F.3d 887, 893 (7th Cir.2000) (concluding that psychiatric hospitalization was not reimbursable as a "related service"). Here, though Plaintiffs go to great lengths to distinguish SLS from a hospital, the facility is nonetheless far more similar to a hospital than a school or even a residential educational facility. SLS's promotional materials indicate that it specializes in the treatment of individuals with "depression, dual diagnosis, psychosis, borderline personality disorder and similar psychological problems." It addresses these conditions through a combination of "assessment, diagnosis, psychotherapy and medication management," as well as a number of group therapy offerings. Furthermore, patient care is coordinated and directed by the patient's personal psychotherapist, which in Courtney's case was a psychiatrist. It is also worth reemphasizing that SLS has no educators on-site, offers no educational services, and is not accredited with or regulated by educational authorities. Second, the Supreme Court offered several guideposts to help determine when medical services are excluded, stating that the definition of medical services was "designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Tatro,* 468 U.S. at 892, 104 S.Ct. 3371. In this case, Courtney's care at SLS may undoubtedly be classified as "unduly expensive." But more importantly, and for the reasons discussed in Part III.B., that care is far beyond the range of competence of any public school district or that of any school nurse.

### D.

In light of the above, we do not believe that SLS can be considered an appropriate

placement. Because we conclude that this aspect of the test for tuition reimbursement has not been met, Plaintiffs are not entitled to tuition reimbursement. Furthermore, Plaintiffs' failure to demonstrate the appropriateness of the private placement means that we need not determine whether the School District deprived Courtney of a FAPE for tuition reimbursement purposes.

## IV.

■■■■ Plaintiffs argue in the alternative that, if tuition reimbursement is not awarded, Courtney is entitled to compensatory education for the time period in which she was at SLS. When parents challenge a school's provision of a FAPE to a child, a reviewing court must (1) consider whether the school district complied with IDEA's procedural requirements and (2) determine whether the educational program was "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). In the event that a student has been denied a FAPE, a court may award compensatory education to account for the period the student was deprived of this right. *Carlisle Area Sch.*, 62 F.3d at 536. This remedy is designed to require "school districts to 'belatedly pay expenses that [they] should have paid all along.'" *M.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 395 (3d Cir.1996) (quoting *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir.1986)).

■■■■ We have held that a plaintiff is entitled to compensatory education under IDEA when "an IEP fails to confer some (i.e., more than *de minimis*) educational

benefit to a student." *Id.* at 396. Furthermore, the right to compensatory education "accrue[s] from the point that the school district knows or should know of the IEP's failure." *Id.* That said, the "disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Id.*

### A.

■■■ The School District did not deny Courtney a FAPE between May 23, 2005 and October 12, 2005 such that Plaintiffs are entitled to compensatory education. Before the District Court, the School District conceded that it denied a FAPE to Courtney during her stay at Rancho Valmora from December 2004 through April 2005.[3] Accordingly, the School District agreed to reimburse Courtney, and has in fact paid, for these expenses. Once informed of Courtney's admission to SLS, however, the School District quickly reengaged—it reconvened Courtney's IEP team on June 15, approximately two weeks after the parents informed the District of Courtney's admission, to reevaluate Courtney's needs and develop a new IEP.

The School District's efforts to develop a new IEP were thwarted by Courtney's acute medical condition. During the meeting, which was attended by school personnel and Courtney's parents, the IEP team called Courtney's behavioral therapist at SLS. The therapist reported that Courtney was in a state of medical crisis and was not sufficiently stable to be evaluated at the time. Before the Hearing Officer, the

---

**3.** The District Court misconstrued this concession. In a brief to the Court, the School District conceded that it failed to provide a FAPE to Courtney when she was enrolled at Rancho Valmora from December 29, 2004 to April 29, 2005. The District Court erroneously construed this concession as applying to Courtney's stay at SLS as well, a construction that is at odds with the brief to which that Court cites.

therapist explained her rationale for this conclusion:

> When Courtney came to us, behaviorally she was too out of control to have her in a one-on-one setting without somebody that was trained in crisis intervention, behavioral modification skills. Courtney was actively self-injuring and becoming aggressive on a daily basis.
>
> She was not able to contract for safety, and she was a threat to herself and others and needed to be on a one-on-one staff support status for quite some time until Courtney was able to refrain from self-injuring and becoming aggressive as frequently as she was when she came in.

A representative of the School District testified that, during the IEP team's conference call with the behavioral therapist, the therapist indicated that "Courtney's condition had deteriorated to a point that she could not access education at all at the time," that she had "attacked staff," and was in "danger of running away." In light of this, the IEP team opted to forego evaluation and the creation of a new IEP until Courtney's treating medical professionals indicated she was sufficiently stable. Courtney's parents agreed to this course of action, and further agreed to inform the School District when Courtney's condition improved such that she could be evaluated for the purpose of developing a new IEP.

Courtney's condition began to improve, and her parents informed the School District on October 12, 2005 that she could be evaluated. On that date, the School District began providing a tutor to teach Courtney English and math. The School District then conducted an evaluation on October 17, 2005, which culminated in a new IEP less than one month later.

The evidence discussed above indicates that, once informed of Courtney's admission to SLS, the School District acted promptly and attempted to respond to Courtney's evolving educational needs. Just as we cannot fault Courtney's parents for not wanting to subject their daughter to an evaluation while in a precarious psychiatric state, we cannot fault the School District for respecting the clear statements of Courtney's treating medical team at SLS that she was not well enough to be evaluated or to receive educational services.

Furthermore, we are reluctant to either fault the School District or impose substantial costs on it for failing to provide what would have been, in this case, an empty procedural protection. As indicated above, an IEP serves to ensure that the student receives services "reasonably calculated" to provide "meaningful educational benefits." Here, though, we have clear and unequivocal statements from Courtney's medical providers that she was not sufficiently stable to receive educational services when she entered the acute-care ward at SLS. Additionally, Courtney's condition had rapidly deteriorated over the preceding months, culminating in her being asked to leave Rancho Valmora. The School District could not reasonably have been expected to prescribe a meaningful treatment plan without having the opportunity to evaluate Courtney's evolving educational needs.

Finally, we note that one of our sister circuits has indicated that an acute medical crisis such as a psychiatric condition permits a school district to deviate from IDEA's procedural protections with regard to the IEP. *Butler,* 225 F.3d 887. In the early 1990s, a class of children with special education needs and their families filed a class action lawsuit alleging that the state of Indiana failed to promptly implement IEPs recommending residential placement. *Id.* at 891. The District Court granted the class action plaintiffs' motion for partial

summary judgment, stating that " 'an IEP must be implemented as soon as possible following the development of the IEP.' " *Id.* (quoting *Evans v. Evans,* 818 F.Supp. 1215, 1222 (N.D.Ind.1993)). The parties to the class action then agreed to a settlement order that "declared that the Indiana Department of Education was obligated by federal law to place disabled children in residential facilities within thirty days of the IEP, except when special circumstances require otherwise." *Id.* (internal quotations omitted). Subsequently, Niki Butler, one of the parties to the class action, alleged that the state had violated the settlement order by failing to promptly implement her IEP. *Id.* at 891–92. When the case reached the Seventh Circuit, however, the Court rejected this argument. Niki's IEP was not implemented because she had suffered an acute psychological crisis that required placement in a hospital for treatment, which the Court characterized as a special circumstance. *Id.* at 892–93. By concluding that Indiana did not run afoul of the settlement order, the Court implicitly recognized that the state had not violated federal law and its obligations under IDEA when it delayed implementation of a student's IEP until the student's acute psychiatric condition stabilized.

The FAPE analysis for compensatory education is not backward looking—courts must look at a school district's actions during the period of the alleged deprivation. In this case, the School District responded promptly after being informed of Courtney's admission to SLS and sought to reevaluate her educational needs and develop a new IEP. Although those efforts were unsuccessful, that failure is attributable to the acute nature of Courtney's medical condition. Accordingly, we conclude that Plaintiffs are not entitled to compensatory education for the period

during which Courtney was in SLS's acute care ward.

**B.**

■■■■ The School District conduct a student specific "analysis that carefully considers the student's individual abilities" and confers meaningful educational benefit. *Ridgewood Bd. of Educ.,* 172 F.3d at 247–48. However, an IEP "provides a 'basic floor of opportunity' but not necessarily 'the optimal level of services....' " *Holmes v. Millcreek Twp. Sch. Dist.,* 205 F.3d 583, 590 (quoting *Carlisle Area Sch.,* 62 F.3d at 533–34). In the present case, we believe this standard has been met.

After the October evaluation and continuing well into her transfer into the post-acute care ward, Courtney continued to have emotional problems. Courtney's behavioral therapist at SLS testified before the Hearing Officer that, as of January 2006, "Courtney ha[d] not been able to meet any of the goals from her initial treatment plan as of yet." The behavioral therapist further testified that Courtney was not ready for outpatient care and that Courtney continued to be aggressive or self-injuring once or twice a week.

Nonetheless, the School District began providing one-on-one tutoring to Courtney on October 12, 2005, the day Courtney's parents notified the School District that she was well enough to be evaluated. It also conducted an evaluation on October 17, 2005 and issued a new IEP less than a month later. The IEP recommended three hours per week of instruction, but determined that it would re-evaluate the situation in three months to determine if Courtney could tolerate additional instruction. As the Hearing Officer found, this "indicated that the School District had considered a return to an alternative special education setting on a full time basis, but rejected that option because [Courtney]

could only tolerate a limited amount of instruction at the time." In fact, the Appeals Panel further stated that "as [Courtney's] mental health continued to improve and her capacity to handle more instruction increased, more hours of instruction were provided."

Plaintiffs characterize as "meager" the School District's provision of only three hours per week of instruction. Though we agree that Courtney's instruction was limited, we believe that the School District's proffer of that level of instruction was reasonable under the circumstances. As the Hearing Officer found, the School District appeared to have considered and rejected offering additional educational services given Courtney's continued emotional difficulties. At the same time, the School District's short-term IEP did enable it to reevaluate Courtney's educational needs as she improved. In fact, as found by the Appeals Panel, the School District increased Courtney's hours of instruction as her condition improved. Accordingly, we conclude that, from October 12, 2005 through January 26, 2006, the School District provided a floor of opportunity on which it could build as Courtney's condition improved. We hold that Courtney was not denied a FAPE for this period.

## V.

For the reasons discussed above, we conclude that Plaintiffs are not entitled to tuition reimbursement or compensatory education for Courtney's stay at SLS from May 29, 2005 through January 26, 2006.